1996 SD 105

**Daniel SHIPPEN, Plaintiff and Appellee,**

v.

**Sherman V. PARROTT, Defendant and Appellant.**

No. 19136.

Supreme Court of South Dakota.

Submitted on Briefs Nov. 29, 1995.

Decided Aug. 28, 1996.

**504**

Robert W. Van Norman, Charles J. Mickel, Rapid City, for plaintiff and appellee.

Charles Poches, Jr., Poches and Lee, Fort Pierre, for defendant and appellant.

ZINTER, Circuit Judge.

■■ Defendant, Sherman Parrott (Parrott), appeals from the trial court's apportionment of damages between actionable and non-actionable events. We affirm in part, reverse in part and remand.

■ Plaintiff, Daniel Shippen (Shippen), is an adult survivor of childhood sexual abuse inflicted by Parrott. The trial court found that Shippen suffers from post-traumatic stress disorder as a result of that abuse. The childhood sexual abuse commenced in 1975, when Shippen was eleven. It continued until 1984 when Shippen was twenty. Parrott also sexually assaulted Shippen on two occasions in 1987 when Shippen was twenty-three. In *Shippen v. Parrott,* 506 N.W.2d 82 (S.D.1993) (*Shippen I* ), Parrott's course of conduct was summarized as follows:

During infancy, Shippen's parents divorced. By age five, his mother had remarried a banker, who died approximately one year later.

Enter Parrott, a man who had worked at the bank with Shippen's stepfather. Parrott and Shippen's mother developed a relationship which lasted for a considerable length of time and eventually became sexual. Parrott's interest quickly spread to Shippen and his siblings. Mother further encouraged Shippen and his twin brother, David, to associate with Parrott, believing him to provide a healthy male adult role model for the boys.

Parrott resided in the basement of the house he shared with his mother, an elderly woman who was bedridden and hard of hearing. His basement living quarters included a pool table, pizza oven, popcorn popper, clown collection and waterbed. In 1975, when Shippen was eleven years old, he began spending the night at Parrott's home, at Parrott's request. Young Shippen, intrigued by the waterbed, asked to sleep in it. This necessitated that he and Parrott, nearly 33 years his senior, sleep together. On one such sleepover, Parrott fondled Shippen's penis. As these visits continued, the sexual conduct escalated to Parrott performing oral sex upon him. Shippen did, however, successfully resist Parrott's attempts at anal intercourse. Similar sexual encounters occurred when Shippen's twin stayed overnight with Parrott.

As Parrott continued his relationship with the mother, and the boys, he provided the

boys with money, clothes and gifts, including securing the return of a repossessed car and replenishing their checking accounts when the balance was low. At one point, he gave Shippen a car, with Parrott remaining on the title as lienholder. Conversely, Shippen's high school academic performance was sub-par. His aggressive behavior not only led to fights, but on one occasion at age 16, he took a loaded pistol to Parrott's home with the intent of killing him. Shippen was by no means monogamous, engaging in sexual relationships with a male classmate and his future wife, Juli, yet continuing his encounters with Parrott. In 1984, when Juli became pregnant, Shippen married her, in part, to escape Parrott's advances. Although no sexual relations between the men occurred during the marriage, they frequently communicated with one another. Occasionally, Parrott sent gifts and money to the couple. In 1986, following marital problems and Shippen's increased involvement with the gay [community] in Minneapolis and other homosexual relationships, he and Juli separated. They divorced two years later. Despite six months of individual and group counseling during his separation, Shippen was unable to reconcile his conflicting homosexual and heterosexual [feelings].

One night in May 1987, Shippen permitted Parrott to stay at his home. Shippen awoke during the night to find Parrott fondling his genitals. Parrott also attempted to perform oral sex on him, but Shippen repulsed the attempt. Parrott again visited Shippen [in June, 1987]. Upon entering the home, Parrott pushed Shippen to the couch, attempted to kiss him and place his hand inside Shippen's pants and tried to force oral sex on Shippen. Once more, Shippen successfully fought off Parrott's advances.

Since 1986, Shippen has continued therapy for mental disorders arising from his sexual conflicts. [At the time of trial he was involved in] a homosexual lifestyle in Colorado.

*Shippen I,* 506 N.W.2d at 84–85.

■ In 1989, Shippen commenced this action for damages. Following a trial to the court, Shippen received a judgment for $75,-846.88 in compensatory damages and $113,-000.00 in punitive damages. The damages were based on two causes of action: sexual assault and battery, and intentional infliction of emotional distress. The damages were awarded for Parrott's acts from 1975 through the two assaults in 1987.

■ Parrott appealed that judgment contending that two statutes of limitation barred the suit. In *Shippen I,* we considered that defense in light of the time and nature of each act. We held that Shippen could not avoid the statute of limitation defense under a continuing tort theory because the sexual contact stopped in 1984 and did not resume until 1987. We also held that any "continued ill effects" of the barred actions were not actionable as a continuing tort. We concluded, however, that "[the two] assaults and batteries occurring two years prior to [the] filing [of the suit were] actionable." *Shippen I,* 506 N.W.2d at 86. "[N]o claims occurring prior to January 3, 1986 under an [intentional infliction of emotional distress] theory—January 3, 1987 for assault and battery—are actionable, i.e., only those sexual contacts occurring during May and June of 1987 fall inside the [statute of limitations]." *Id.*

■ Because the trial court's original judgment included damages for Parrott's non-actionable conduct dating back sixteen years to 1975, we reversed the damage award. *Id.* at 87. We remanded the matter to the trial court "for a reassessment of compensatory damages for those torts suffered during the statutory period . . ., particularly those two acts in 1987 . . . and punitive damages for those causes of action occurring subsequent to January 3, 1986." *Id.*

■ On remand, there was a substantial disagreement between the parties concerning the right to present new evidence and the scope of further discovery. Parrott objected to the introduction of any additional evidence. On the other hand, Shippen did not respond to Parrott's discovery requests regarding new evidence. After almost one year of procedural disputes, including an intermediate appeal to this Court, the trial court decided not to receive additional evi-

dence. The trial court determined that it would apportion damages between the actionable and non-actionable events on the original trial record.[1]

■■ On remand, the trial court heard oral argument concerning the apportionment of damages. The trial court ultimately reduced the compensatory award to $49,700.00 for the two 1987 assaults. The trial court did not reduce the punitive award of $113,000.00. Parrott appeals again.

■■ The trial court took the following action with respect to each element of Shippen's claimed damages:

### Compensatory Damages

| | Original Award | Apportioned Award |
|---|---|---|
| A. | $7,476.88—was initially awarded for Shippen's past medical, psychological, hospital and counseling expenses. | $1,130—was awarded on remand. The trial court apportioned this amount to the 1987 assaults because $1,130 of the $7,476.88 was incurred after the 1987 assaults. |
| B. | $28,800—was initially awarded for past mental anguish, pain, suffering and distress. The trial court awarded $5 a day or $1,800 a year for 16 years from 1975. | $9,000—was awarded on remand. The trial court arrived at $9,000 by awarding $5 a day from May and June of "1986." (Both parties agree that the year "1986" is a typographical error because the assaults occurred in 1987. Consequently, Shippen concedes that this award should be further reduced by one year's damages ($1,800) to $7,200). |
| C. | $33,720—was initially awarded for four to five years of future | $33,720—was again awarded on remand. |
| | therapy, medication and psychiatric services the trial court found would be necessary. | |
| D. | $5,850—was initially awarded for four to five years of future mental anguish and suffering the trial court found Shippen would endure. | $5,850—was again awarded on remand. |
| Total: | $75,846.88 | $49,700.00 |

### Punitive Damages

| | | |
|---|---|---|
| E. | $113,000—was initially awarded. The punitive damages were calculated as 35 percent of Parrott's net worth after payment of compensatory damages. These punitive damages were originally awarded to "punish" Parrott for his conduct over the past 16 years for "that which every adult knows should not be done— *child* sexual molestation" and to deter others. (emphasis added). | $113,000—was again awarded on remand. |

Thus, the trial court apportioned the pre-trial damages for medical expenses and mental anguish. However, the trial court declined to apportion the future damages for medical expenses and mental anguish. The trial court declined to apportion the future damages because it found that the two 1987 assaults "aggravated" a preexisting mental condition and "[it would be] logically difficult if not impossible" to apportion between Shippen's preexisting condition and the future damages arising out of the two 1987 aggravating acts.[2] The trial court finally declined to

---

1. Neither party has appealed the trial court's decision to apportion damages without new evidence. Furthermore, neither party has appealed any discovery issue.

2. Although the trial court found that Shippen's "dysfunctional condition resulted mostly because of being sexually abused during his childhood" and that the prior abuse is also a cause of the future damages, it found that the two 1987 assaults were the two "latest or nearest cause to the future damages...." The trial court also found that Shippen was in a "vulnerable period" in 1987, that he was "starting to break out of his problems in therapy, and then along came [Parrott] in May and June of 1987, and assault[ed] [Shippen] again." The trial court found that these two tortious acts were an immediate cause

which caused some of the damages which Shippen will sustain in the future. The trial court further found that Parrot knew or should have known of Shippen's vulnerable mental condition and that the two tortious assaults "aggravated a preexisting condition or mental ailment." Although the trial court noted that damages for the pre-existing condition were barred by the statute of limitations, it concluded that Parrot must take Shippen "as he finds him." Consequently, the trial court found that the two 1987 assaults "concurred with the other cause, i.e., prior abuse, and acting in conjunction therewith, caused the future damages Plaintiff will incur." Because the trial court found that apportioning monetary damages between the preexisting condition and the two aggravating assaults was "logically diffi-

reduce the punitive damage award because of Parrott's "intent ..., [h]is· repulsive attitude and deplorable behavior ..., his financial condition," because Parrott was "not the least bit remorseful ... [and because Parrott] should be punished and others deterred."

## APPORTIONMENT OF DAMAGES BETWEEN ACTIONABLE AND NON–ACTIONABLE EVENTS

■■ In reassessing compensatory damages, the trial court first applied the damage rule generally applicable in aggravation cases. The trial court then applied a related rule of apportionment to the pre-trial damages, but it applied a non-apportionment exception to the future damages.

■■ ■■ The damage rule generally applicable in aggravation cases makes a defendant responsible for the aggravation of any preexisting condition or ailment. An injured party is entitled to an award in an amount which will reasonably compensate that party for all damages suffered as a result of the injury, including the aggravation of any preexisting condition. *Stoltz v. Stonecypher,* 336 N.W.2d 654, 657–58 (S.D.1983); *Bertness v. Hanson,* 292 N.W.2d 316, 319 (S.D.1980); *Pollman v. Ahrens,* 88 S.D. 249, 218 N.W.2d 475, 476–77 (1974). However, in such cases, the plaintiff has the burden of proving that the subsequent act caused or aggravated the injury. *Bertness,* 292 N.W.2d at 319. This requires evidence that the subsequent act had a worsening effect on a preexisting injury or made the preexisting condition "more difficult to treat." *Pollman,* 218 N.W.2d at 476. We have also found "aggravations" where the subsequent act "superimposes" or "adds or imposes [injury] without integrating." *Id.* at 477.

■■ ■■ While aggravation damages are generally recoverable, there is a limitation. Damages are not awarded for "any previous or subsequent ailments or injuries unrelated to the [actionable event]." *Stoltz,* 336 N.W.2d at 658. This limitation is a recognition of the apportionment rule that damages arising out of actionable and non-actionable events should be apportioned if possible.

■■ ■■ While we have adopted these aggravation and apportionment rules, we have not previously considered the non-apportionment exception applied by the trial court. Most other states do, however, recognize that a non-apportionment exception exists when there is a preexisting condition, when an actionable event aggravates the preexisting condition and when no apportionment of the disability can be made between that caused by the preexisting condition and that caused by the actionable event. In such cases, even though a portion of the present and future disability is directly attributable to the preexisting condition, the defendant whose act of negligence was the cause of the subsequent act is responsible for the entire damage.[3]

---

cult if not impossible," it concluded that the non-apportionment exception discussed later in this opinion should be applied and that Parrot was liable for all future damages previously awarded.

**3.** *See Owen v. Dix,* 210 Ark. 562, 196 S.W.2d 913, 915 (1946) (when defendant's negligence aggravates a dormant or diseased condition, defendant is liable for entire damages, notwithstanding the dormant or diseased condition); *Newbury v. Vogel,* 151 Colo. 520, 379 P.2d 811, 813 (1963) (when a preexisting condition is aggravated and apportionment between the preexisting condition and the aggravating event cannot be made, the defendant who caused the aggravating event is responsible for the entire damage); *Winn–Dixie Stores, Inc. v. Nafe,* 222 So.2d 765, 766 (Fla.Dist. Ct.App.1969) (when the jury cannot apportion damages between an aggravating event and a preexisting disease, all damages are assessed to tortfeasor); *Matsumoto v. Kaku,* 52 Haw. 629, 484 P.2d 147, 149 (1971) (when a plaintiff with a diseased condition suffers injuries due to defendant's negligence and damages between the diseased condition and the defendant's negligence cannot be apportioned, the defendant is liable for the entire damage); *Blaine v. Byers,* 91 Idaho 665, 429 P.2d 397, 405–06 (1967) (worsening of plaintiff's preexisting arthritic condition due to defendant's negligent act is attributable to defendant when apportionment between the preexisting arthritic condition and the worsened arthritic condition cannot be made); *Bushong v. Kamiah Grain, Inc.,* 96 Idaho 659, 534 P.2d 1099, 1101 (1975) (defendant who aggravates a plaintiff's preexisting condition through an act of negligence is liable for the entire damage if apportionment between the preexisting condition and the defendant's negligence is not possible); *Becker v. D & E Distributing Co.,* 247 N.W.2d 727, 731 (Iowa 1976) (when a preexisting condition is aggravated and no apportionment can be made between the preexisting condition and the aggra-

This non-apportionment exception arises out of the policy that in aggravation cases uncertainty as to causation should be resolved in favor of the victim. The non-apportionment exception gives the benefit of doubt in determining damages to the party found to have been wronged. *Bigley v. Craven*, 769 P.2d 892, 896 (Wyo.1989) (citing *McNabb v. Green Real Estate Co.*, 62 Mich. App. 500, 233 N.W.2d 811, 820 (1975)).

The exception does not, however, remove a plaintiff's burden of showing that the negligence of the defendant was a substantial factor in causing the harm. Restatement (Second) of Torts, § 433B cmt (a) (1965). *See also Bigley, supra;* Restatement (Second) of Torts, § 433A cmt (i). We have recently reaffirmed the substantial factor requirement when more than one cause allegedly contributes to an injury. *Therkildsen v. Fisher Beverage*, 1996 SD 39, ¶ 13, 545 N.W.2d 834, 837 (1996).

Both the apportionment rule and the substantial factor requirement for application of the non-apportionment exception are specifically recognized in the Restatement (Second) of Torts. Section 433A provides:

(1) Damages for harm are to be apportioned among two or more causes where

(a) there are distinct harms, or

(b) there is a reasonable basis for determining the contribution of each cause to a single harm.

(2) Damages for any other harm cannot be apportioned among two or more causes.

Comment (i) to subsection 2 explains the exception, including the substantial factor requirement:

Certain kinds of harm, by their very nature, are normally incapable of any logical, reasonable, or practical division.... By far the greater number of personal injuries ... are thus normally single and indivisible. Where two or more causes combine to produce such a single result, incapable of division on any logical or reasonable basis, *and each is a substantial factor* in bringing about the harm, the courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm....

Such entire liability is imposed where some of the causes are innocent.... It is imposed where either cause would have been sufficient in itself to bring about the result.... [In such cases] if the Defendant is liable at all, [the Defendant] is liable for the entire indivisible harm....

Restatement Second of Torts, § 433A, cmt (i) at 439–440 (emphasis added).

Although Parrott does not take issue with these rules, he contends that the evidence does not warrant any award of damages for the 1987 assaults. Parrott points out that the findings of fact from the original trial (which were incorporated into the trial court's damage reassessment decision) state that Shippen's damages arose out of the "childhood sexual abuse" without any reference to the 1987 assaults. Parrott also argues that there is no trial evidence apportioning damages or indicating the 1987 assaults were a substantial factor in causing any non-apportionable damages. Therefore, Parrott argues that any damage award for the 1987 assaults is not supported by the evidence or the trial court's original findings of fact.

## ANALYSIS

### Compensatory Damages

Unfortunately, neither party provided the trial court with apportionment

---

vation, the tortfeasor whose act of negligence caused the aggravation is responsible for the entire damage even though a portion of the present and future disability is attributable to the preexisting condition); *Richman v. City of Berkley*, 84 Mich.App. 258, 269 N.W.2d 555, 557 (1978) (when trauma aggravates a preexisting condition, even though a portion of the present disability is directly attributable to the preexist-

ing condition, the defendant whose act of negligence caused the trauma is responsible for all damages); *Bigley v. Craven*, 769 P.2d 892, 894 (Wyo. 1989) (when a preexisting condition is aggravated by a subsequent trauma and no apportionment between injury caused by the preexisting condition and injury caused by the subsequent trauma can be made, the tortfeasor of the trauma is responsible for the entire damage).

evidence on remand. Therefore, we must determine whether there is an evidentiary basis in the original record for the trial court's apportionment of Shippen's pre-trial damages and the trial court's application of the non-apportionment exception to his future damages. Our review of the original trial record reveals that there is an evidentiary basis for the apportioned pre-trial damages. The record does not, however, support application of the non-apportionment exception for Shippen's future damages. The exception does not apply because there is no evidence of the necessary predicate that *the 1987 assaults* aggravated a preexisting condition and were a substantial factor in bringing about Shippen's future harm.

■■■ At the outset, it should be noted that in original Finding of Fact 44, the trial court specifically found that "the childhood sexual abuse is a very large contributing factor or controlling factor in [Shippen's] present problem." In fact, the trial court found that "[Shippen] will be dysfunctional for many years and that this is caused by or stems from the *childhood* sexual abuse as well as other *childhood* traumas." (emphasis added). In its original Conclusion of Law 3, the trial court concluded that "[a]s a result of the continuing sexual molestation by [Parrott] during [Shippen's] *minority,* the mental illness which evolved into repression or suppression, came into existence." (emphasis added.) There are, however, no original trial findings reflecting that the 1987 assaults aggravated the mental illness or were a substantial factor in Shippen's future damages.

■■■ There is also no evidence from the original trial to establish such findings. Although Shippen argues that the trial court's non-apportionment findings are supported by the expert testimony, neither Shippen's psychiatrist, Dr. Charles Lord; Shippen's psychologist, Dr. William Arbes; Shippen's psychiatric social worker, Joseph Roberts nor Parrott's forensic psychiatrist, Dr. Daniel Kennelly were even asked if any element of Shippen's damages was related to the 1987 assaults. Consequently, no expert testified that the 1987 assaults aggravated a preexist-ing condition or were a substantial factor in causing Shippen's damages. Each expert merely described Shippen's mental problems and related his damages to the childhood sexual abuse.

■■■ For example, Joseph Roberts, a psychiatric social worker, testified as an expert on adult survivors of "sexual child abuse" and post-traumatic stress disorder. Roberts described post-traumatic stress disorder as a category for people who have gone through trauma "earlier in their life." However, his testimony all related to adult survivors of "child sex abuse." He did not indicate that the 1987 assaults aggravated Shippen's condition or were a substantial factor in Shippen's damages. In fact, Roberts specifically stated that he had not determined the chronological time in which the post-traumatic stress disorder arose.

■■■ Dr. Arbes' discussion of Shippen's problems was also limited to Shippen's childhood abuse. Dr. Arbes testified that Shippen's problems were caused by sexual abuse which started at age eleven and continued through adolescence and young adulthood. However, Dr. Arbes did not refer to the 1987 assaults. Dr. Arbes' ultimate conclusion was that the childhood sexual abuse was the "controlling factor." In fact, when questioned by the trial court about the matter, Dr. Arbes specifically testified that the "events" that they were talking about took place "not a decade, but a long time ago."

■■■ Dr. Lord agreed that the diagnosis of post-traumatic stress disorder was "the result of *childhood* abuse, various kinds." (emphasis added.) When asked to describe the source of Shippen's problems, Dr. Lord testified that Shippen's difficulties "stem directly from his childhood and that includes the sexual, emotional abuse we talked about as well as his early childhood development and conflicts." Dr. Lord described Shippen's symptoms as being consistent with "having been sexually abused as a youth." Although Dr. Kennelly could not come to a definitive psychiatric diagnosis, he was also not asked whether the 1987 assaults caused any of Shippen's damages.

In summary, no expert related the 1987 assaults to Shippen's damages. Furthermore, no expert testified that the 1987 assaults had a worsening effect on a preexisting mental condition or that the 1987 assaults made Shippen's preexisting condition more difficult to treat. Therefore, the expert testimony does not support the trial court's findings on remand that the 1987 assaults aggravated Shippen's mental condition or were a substantial factor in causing Shippen's damages.

Shippen was the only witness who provided any evidence on apportionment of damages. That testimony does support the trial court's apportionment of Shippen's pre-trial medical and mental anguish damages. It does not, however, support the trial court's aggravation findings concerning Shippen's future damages.

Shippen testified that the May 1987 assault occurred after Shippen and Parrott had gone out to dinner together and had returned to Shippen's apartment. Shippen testified that after Parrott invited himself in, Shippen was nervous and anxious, but "they went to bed peacefully." When Shippen awoke in the morning to find Parrott performing oral sex, Shippen said "no" and pushed Parrott away. Parrott voluntarily left. The June 1987 assault arose when Shippen left a note on Parrott's car asking Parrott to come to Shippen's apartment. Shippen testified that when Parrott arrived, Parrott put his hands in Shippen's pants and tried to "french kiss him." Shippen again said "no" and after a brief struggle, Parrott left.

With respect to damages, Shippen testified that the June assault involved some force which left red marks on Shippen's chest, stomach and wrist. He also testified that he felt "terrible" and "totally distraught" as a result of both incidents. He testified that he gave up his apartment, "hit the road" and began staying in parks in Eastern South Dakota and Western Minnesota. Shippen testified that in 1988 he was still experiencing "panic attacks, sleeplessness, being scared ... [and] agitated" for which he sought counseling at a mental health center.

This testimony concerning mental anguish and medical treatment following the 1987 assaults, when viewed most favorably to support the judgment, supports the trial court's apportioned award for post-assault counseling expenses ($1,130) and post-assault mental anguish, pain and suffering ($7,200). However, like the experts, Shippen did not testify that the 1987 assaults aggravated his mental condition and were a substantial factor in causing his future damages. The only evidence in the record relates Shippen's future mental anguish and need for future medical treatment to the non-actionable childhood abuse. Consequently, Shippen's testimony does not support the award for future medical expenses ($33,720) and future mental anguish ($5,850).

## Punitive Damages

In reaffirming the original punitive damage award, the trial court utilized the five criteria we enumerated in *Flockhart v. Wyant*, 467 N.W.2d 473 (S.D. 1991) and *Ruple v. Brooks*, 352 N.W.2d 652 (S.D.1984).[4] Although the trial court noted that it reduced the compensatory damage award on remand, it also noted that if its original thirty-five percent of net worth formula was used after reduction of the compensatory award, an increase of the punitive damage award would result. Nevertheless, we conclude that because the amount of compensatory damages is one factor which must be considered in determining the amount of punitive damages, because the amount of compensatory damages has been significantly reduced by this Court and because $113,000 is the exact amount originally awarded for "child" sexual molestation, the punitive damage award must be reconsidered.

**4.** Those factors are: (1) the amount allowed as compensatory damages; (2) the nature and enormity of the wrong; (3) the intent of the wrongdoer; (4) the wrongdoer's financial condition; and (5) all of the circumstances attendant to the wrongdoer's action. *See Flockhart v. Wyant*, 467 N.W.2d 473, 479 (S.D.1991); *Ruple v. Brooks*, 352 N.W.2d 652, 656 (S.D.1984).

A punitive damage award is subject to revision by this Court. *Hannahs v. Noah*, 83 S.D. 296, 158 N.W.2d 678, 684 (1968); *Stene v. Hillgren*, 78 S.D. 1, 98 N.W.2d 156, 159–60 (1959).[5] We have now considered this record and the punitive damage award on two occasions. After considering all relevant factors, we conclude that the punitive damage award should be reduced to $25,000. A remittitur allowing $25,000 in punitive damages is ordered.[6]

Within thirty days from the date of this opinion, Shippen shall file in this Court a written election to accept or reject judgment in the sum of $33,330 ($25,000 + $1,130 + $7,200) together with interest thereon at the legal rate from the date of judgment of the trial court and costs in that court. If that judgment is accepted, the judgment of the trial court, as modified by the election of Shippen, will be affirmed and no costs will be taxed in this Court. If Shippen does not so elect, the judgment shall be reversed with costs on appeal to the appellant and a new trial on punitive damages ordered.

Affirmed in part, reversed in part and remanded.

MILLER, C.J. and GILBERTSON, J., concur.

AMUNDSON, J., concurs in part and dissents in part.

SABERS, J., dissents.

ZINTER, Circuit Judge, for KONENKAMP, J., disqualified.

AMUNDSON, Justice (concurring in part and dissenting[ in part]).

I concur with the majority's analysis of the compensatory damages; however, I would not remit the punitive damage award.

In *Schaffer v. Edward D. Jones & Co.*, 521 N.W.2d 921, 927 (S.D.1994) (*Schaffer I* ), this court held:

> In determining the amount of punitive damages, as well as deciding whether they should be given at all, *the trier of fact can properly consider not merely the act itself but all circumstances including the motives of the wrong-doer, [and] the relations of the parties.* (Emphasis added.) (Quotations and citations omitted.)

Further, the recent United States Supreme Court decision in *BMW of North America, Inc. v. Gore*, 517 U.S. ——, 116

---

5. It should also be noted that the trial judge who originally heard the evidence has since retired from the bench and is unavailable to reconsider the punitive damage award. Without stipulation of the parties, a successor judge has no authority to render a decision in a case where he or she has not heard the testimony. *Hinman v. Hinman*, 443 N.W.2d 660, 661 (S.D.1989). Finally, both parties waived the right to present new evidence on apportionment. Therefore, we deem it appropriate to revise this portion of the judgment.

6. Both dissents decline to remit the same punitive damage award that was made by the trial court following the original trial and the apportionment hearing. The dissents decline to remit although we specifically held that any "continuing ill effects" of the barred actions are not compensable. *Shippen I*, 506 N.W.2d at 85. We respectfully conclude that the failure to reduce the punitive damages originally awarded for the non-actionable *child* sexual abuse would impermissibly award Shippen damages for the "continued ill effects" of the barred actions. Our conclusion is supported by the fact that the trial court only referred to *child* sexual abuse as the

basis for its first award. Our conclusion is also supported by the language of the dissent. The dissents' punitive award is specifically based upon "the total picture *rather than just the isolated incident[s] which serve[ ] as the basis for the compensatory award*," *infra* at ¶ 38 and upon "Parrott's conduct in *taking advantage* of Shippen *and* his twin brother *over a course of time*," *infra* at ¶ 39 (emphasis added). Basing punitive damages on "taking advantage of Shippen over a course of time" and upon the "total picture" rather than the conduct which is the basis of the actionable event effectively awards Shippen damages for the ill effects we found non-actionable in *Shippen I*. While we do agree that the Court can properly consider all circumstances including the motives of the wrongdoer and the relations of the parties, *Schaffer v. Edward D. Jones & Co.*, 521 N.W.2d 921, 927 (S.D.1994), nevertheless, punitive damages may not be imposed to "punish" or to "deter" non-actionable conduct. *BMW v. Gore*, 517 U.S. ——, ——, 116 S.Ct. 1589, 1598, 134 L.Ed.2d 809, 825 (1996). Furthermore, basing the damages on Parrott's conduct towards Shippen's brother awards damages to Shippen for acts against a third person who has made no claim in this case.

S.Ct. 1589, 134 L.Ed.2d 809 (1996) (holding that a $2,000,000 punitive damage award was grossly excessive and therefore exceeds the constitutional limit) recognized "that repeated misconduct is more reprehensible than an individual instance of malfeasance." Therefore, when assessing punishment by way of punitive damages, it is appropriate to look at the total picture rather than just the isolated incident which serves as the basis for the compensatory award.[7]

> When the recovery of punitive damages is sought and the pleadings properly disclose circumstances which justify an allowance of such damages, any matters of evidence having a reasonable tendency to establish the existence or nonexistence of a fact or circumstance warranting the allowance of such damages may be introduced. Thus, evidence of any fact which legitimately tends to show the motive and intent of the defendant in doing the act complained of is admissible[.]

22 AmJur2d § 925 at 951–52 (2dEd 1988).

 Parrott's conduct in taking advantage of Shippen and his twin brother over a course of time is unquestionably reprehensible so that it warrants punishment. This total conduct was appropriately considered by the trial court as relevant to the issues of motive and evil intent. In considering the total picture in this case, I cannot agree that the punitive damage award of $113,000.00 was excessive. Therefore, I would affirm the punitive damage award in total.

SABERS, Justice (dissenting).

 I join Justice Amundson's writing.

 This punitive damage award is subject to revision by this court under *Hannahs v. Noah*, 83 S.D. 296, 306–07, 158 N.W.2d 678, 684 (1968); and *Stene v. Hillgren*, 78 S.D. 1, 7–8, 98 N.W.2d 156, 159–60 (1959).

 The *Hannahs* and *Stene* courts considered essentially the same factors outlined in *Flockhart v. Wyant*, 467 N.W.2d 473, 479 (S.D.1991), in revising punitive damage awards. While a jury is often instructed to consider the five *Flockhart* factors in determining punitive damages, see Civil Pattern Jury Instr. 35–01, it is not required to list factors actually considered or amounts for each factor. We should consider all relevant factors and proceed under *Hannahs* and *Stene* to revise the punitive damage award to an amount this court determines adequate, without tying punitive damages to compensatory damages, as reduced, or to the amount set by the trial court.

 In my view, the defect in the majority opinion is that the punitive damages award appears to be some portion or percent of the amount set by the trial court and is totally inadequate. We should set the amount we determine as adequate without regard to the amount set by the trial court. *Hannahs*, 83 S.D. at 306–07, 158 N.W.2d at 684; *Stene*, 78 S.D. at 7–8, 98 N.W.2d at 159–60.

 We have stated that the amount must be sufficiently high to deter similar future conduct. *Schaffer v. Edward D. Jones & Co.*, 1996 SD 94, ¶ 25, 552 N.W.2d 801 (1996) (*Schaffer II*) (citing *Hulstein v. Meilman Food Industries*, 293 N.W.2d 889, 892 (S.D.1980); *Bogue v. Gunderson*, 30 S.D. 1, 137 N.W. 595, 596 (1912)). Here, Parrott committed numerous acts of child sex abuse and two acts of adult sex abuse. Even if all reference to child sex abuse is deleted, Parrott's conduct is incredibly reprehensible. He has shown no remorse. In fact, he sneered at his victims during the trial. His attitude and arrogance apparently continue

---

**7.** The majority states that "[b]asing punitive damages on 'taking advantage of Shippen over a course of time' and upon the 'total picture' rather than the conduct which is the basis of the actionable event effectively awards Shippen damages for the ill effects we found non-actionable in *Shippen I.*" This assertion is flawed, however, because punitive damages are awarded to set an example and to punish a defendant, not for ill effects suffered by the plaintiff. Without allowing a consideration of the total picture, the court is putting blinders on the trial court in assessing the appropriate amount for punitive damages. Furthermore, the United States Supreme Court noted that repeated misconduct is relevant when determining the award for punitive damages. *BMW*, 517 U.S. at ——, 116 S.Ct. at 1599–1600, 134 L.Ed.2d at 827.

to the present. His conduct concerning adult sex abuse, past and present, must be adequately punished and deterred. Under all the circumstances, I would set the amount at a minimum of $113,000. Anything less is inadequate for punishment or deterrence. *Schaffer*, 1996 SD 94, ¶ 25, 552 N.W.2d 801.