1997 SD 121

Jack J. GRYNBERG, d/b/a Grynberg Petroleum Company; Janex Oil Co., Inc.; Andrew Kugler, Jr.; W.B. Newberry; Janex Oil Co. Reserve Fund 90–7A Ltd.; Headington Oil Properties, Inc.; H.A. Mayor, Jr.,; Carl G. Mammel; Dr. Keith Mccorrmic; Preston Investments; and Lloyd Peterson, Plaintiffs and Appellees,

v.

CITATION OIL & GAS CORP., Defendant and Appellant.

No. 19258.

Supreme Court of South Dakota.

Argued Oct. 24, 1996.

Reassigned July 10, 1997.

Decided Oct. 22, 1997.

Rehearing Denied Dec. 2, 1997.

Max S. Main of Bennett, Main & Frederickson, P.C., Belle Fourche, Tom C. Toner of Yonkee & Toner, Sheridan, WY, for plaintiffs and appellees.

Craig A. Pfeifle, Steven J. Helmers of Lynn, Jackson, Shultz & Lebrun, P.C., Rapid City, for defendant and appellant.

GILBERTSON, Justice.

[¶ 1.] Defendant Citation Oil and Gas Corporation (Citation) appeals a jury verdict in favor of plaintiffs for breach of contract, fraud and punitive damages resulting from its wrongful actions as operator of certain oil wells. We affirm in part, and reverse and remand with remittitur on the issue of punitive damages.

## FACTS AND PROCEDURAL BACKGROUND

[¶ 2.] This case involves the operation of two oil fields located in Fall River County near the Wyoming–South Dakota border: the North Hollingsworth Field and the East Simms Field. At various times, the plaintiffs acquired oil and gas leases in one or both of the fields and entered into or became subject to Joint Operating Agreements (JOAs) with Citation. Citation was the operator of the fields. As operator, Citation was responsible for managing the exploration and production of oil and for accounting for profits and expenses on behalf of all of the owners.

[¶ 3.] The JOAs provided for what is referred to as a "nonconsent penalty." Under the JOAs, if an owner wanted to drill a well, that owner would make a proposal to the other owners and submit an Authorization For Expenditure (AFE) setting forth the cost to drill and complete the well. The other owners could then elect to either share in the cost of drilling the proposed well or go "nonconsent" and not share in those costs. If the well was drilled and was a dry hole, the owners who elected to go nonconsent did not have to pay any of the costs of the unsuccessful drilling. However, if the well produced oil, the owners who elected to share in the cost of drilling the well were entitled to recover their costs plus a nonconsent penalty from the nonconsenting owners. There were two tiers of nonconsent penalties, the first ranging from 300 percent to 400 percent of the costs incurred up to the wellhead (costs incurred for work done below the surface of the ground, such as drilling, casing, and completing). The second tier ranged from 100 percent to 200 percent of the costs incurred after the wellhead (costs incurred for surface equipment, production roads, and operating expenses). In short, the owners who put up the money to drill the well were entitled to recover from the production of that well several times their actual costs as a penalty before the nonconsenting owners would receive any share of the proceeds from that well.

[¶ 4.] The JOAs further required that Citation provide the owners with monthly Pay-out Status Reports (PSRs), which were itemized statements of the costs of drilling, completing, and equipping each well, and any nonconsent penalties owed. The JOAs also provided for the removal of Citation as operator, by majority vote of the nonoperators, should Citation fail or refuse to carry out its duties.

[¶ 5.] In 1984 Citation proposed the drilling of the North Hollingsworth 1–19 well (the 1–19 well). According to the AFE submitted by Citation, it would cost $327,000 to drill, complete and equip the well. Some of the plaintiffs or their predecessors elected to go nonconsent. Citation drilled the 1–19 well, which came in as a good producing well. Therefore, Citation, along with the other owners who elected to share in the cost of the 1–19 well, was entitled to nonconsent penalties from the nonconsenting owners with respect to costs associated with the 1–19 well. Within approximately twelve months, two additional wells were drilled on the North Hollingsworth field. None of the owners went nonconsent with respect to these additional wells, both of which produced oil.

[¶ 6.] After the wells were drilled, Citation began improperly allocating costs to the 1–19 well. This allocation maximized Citation's receipt of nonconsent penalties. Specifically, Citation misallocated to the 1–19 well: (1) the entire cost of a production road ($27,000), which actually served *all seven wells in both fields;* (2) the entire cost of a tank battery ($39,416), which was used to store oil from *all* of the wells in the North Hollingsworth Field; (3) the entire cost of converting a well used to dispose of salt water produced from *wells in both fields* ($13,571); and (4) other costs for work actually done on other wells. In addition, Citation improperly moved items which belonged in the 200 percent nonconsent penalty category (costs incurred after the wellhead) into the 400 percent category (costs incurred up to the wellhead).[1]

[¶ 7.] For approximately two years, these misallocations continued undetected by the owners. The PSRs did not itemize expenses, instead using "lump sum" amounts. Additionally, PSRs were not provided on a monthly basis as required by the JOAs. Although over seventy PSRs should have been sent out by Citation over the period it was operator, only eleven PSRs were provided.

[¶ 8.] In 1986 an audit was conducted by TIPCO, one of the owners. TIPCO discovered Citation's improper charges to the 1–19 well. TIPCO submitted its audit report to

---

1. For example, not only did Citation improperly allocate the entire cost of the production road to the 1–19 well, but it put this cost in the 400 percent penalty category. In addition, Citation charged 400 percent penalties on expenses of hauling water after production had been achieved and on various services relating to installing tank batteries and flow lines beyond the wellhead after it is established that a producing well exists.

Citation in September 1986 objecting to the allocation. Citation did not respond until June 15, 1988, but agreed that it had misallocated costs associated with the production road, the tank battery, and the salt water disposal well. Citation granted TIPCO's exceptions. However, Citation did not reallocate these costs to the other owners and neither the TIPCO audit nor Citation's response were provided to the other owners.

[¶ 9.] On June 23, 1989, Citation sent out another inaccurate PSR. This report was again not itemized and still contained the improper allocations.

[¶ 10.] From 1984 to 1991 Citation allocated operating costs (*e.g.*, salaries, vehicles, insurance, and supervision) equally among the seven wells on the North Hollingsworth and East Simms Fields. In August 1991 Citation unilaterally converted to a volumetric method of allocation.[2] As a result, costs which had previously been charged to owners of the East Simms Field (which had become uneconomical) were shifted to the owners of the North Hollingsworth Field. In effect, the owners of wells in the North Hollingsworth Field were subsidizing the East Simms Field, allowing the East Simms Field wells to continue to produce. Citation was then able to continue to collect overhead charges and allocate salary expenses to East Simms Field wells.

[¶ 11.] Representatives of the owners met with Citation on September 20, 1991. Although Citation had already changed to the volumetric method of allocation, Citation stated during the meeting that it was still allocating costs on a per-well basis. Citation also represented that it would relinquish its position as operator, if a majority of the owners so desired. Based on Citation's representations regarding the cost allocation method and its willingness to step down as operator, the owners allowed Citation to continue as operator.

[¶ 12.] Finally in March 1992 a majority of the owners of each field voted to remove Citation as operator. Despite its earlier representation that it would step down, Citation refused to do so.

[¶ 13.] Plaintiffs filed suit against Citation alleging fraud and breach of contract, seeking compensatory and punitive damages and the removal of Citation as operator. The jury returned a verdict in favor of the plaintiffs, awarding $222,850 for breach of contract, $354,250 for fraud, and $4.8 million in punitive damages. The trial court denied Citation's motions for judgment notwithstanding the verdict and for new trial, and Citation appealed.

[¶ 14.] Citation raises the following issues on appeal:

1. Did Citation's actions give rise to an independent tort cause of action for fraud and a claim for punitive damages?

2. Was the jury properly instructed on the elements of deceit?

3. Did the trial court err in providing the jury with a "global" punitive damages form?

4. Was the punitive damages verdict unreasonable and excessive as a matter of law?

## ANALYSIS AND DECISION

[¶ 15.] **1. Did Citation's actions give rise to an independent tort cause of action for fraud and a claim for punitive damages?**

[¶ 16.] This Court has recently handed down two decisions on the issue of independent torts arising from contract. *See Sundt v. State ex rel. SD Dep't of Transp.*, 1997 SD 91, 566 N.W.2d 476; *Fisher Sand & Gravel Co. v. State ex rel. SD Dep't of Transp.*, 1997 SD 8, 558 N.W.2d 864. Both *Sundt* and *Fisher* involved highway construction contracts,[3] and in both cases, we held that there was no independent tort which would give rise to punitive damages. The distinctively

---

**2.** Out of over 3,000 wells that Citation operated nationwide, the seven wells located on the North Hollingsworth and East Simms Fields were the only wells where such operating costs were allocated on a volumetric basis.

**3.** Both *Fisher* and *Sundt* sued the South Dakota Transportation Department pursuant to SDCL 31–2–34, which requires a contract or quasi-contract.

different facts of the case now before us justify a different result.

[¶ 17.] Punitive damages "are not ordinarily recoverable in actions for breach of contract, because, as a general rule, damages for breach of contract are limited to the pecuniary loss sustained." *Hoffman v. Louis Dreyfus Corp.*, 435 N.W.2d 211, 214 (S.D.1989) (quoting 22 Am.Jur.2d *Damages* § 751 (1988)). There are public policies underpinning this general rule. First, breach of contract is generally a private injury, unlike a malicious tort, which some authorities have held to be a public injury. L. Schleuter & K. Redden, 1 *Punitive Damages* § 7.2 (3d ed. 1995). Second, our free market system allows economically efficient breaches of contract, for example, when it costs less for one party to breach an unwise contract and to pay the other party compensatory damages than it would cost to completely perform the contract. Third, "[w]hile compensatory damages encourage reliance on business agreements, the threat of additional punitive damages would create uncertainty and apprehension in the marketplace." *Id.*

[¶ 18.] Nonetheless, the majority of jurisdictions allow punitive damages in breach of contract cases under certain circumstances, including: conversion; forgery; breach of fiduciary duty; tortious interference with business expectancy; intentional breaches accompanied by willful acts of violence, malice or oppressive conduct; fraud; and, breach of covenant of good faith and fair dealing. *Id.* at § 7.3 (listing cases). Punitive damages may arise in these situations when the complaining party can prove an independent tort that is separate and distinct from the breach of contract. *Hoffman*, 435 N.W.2d at 214. "While the independent tort may occur at the time of and in connection with the breach, or may arise out of the same transaction, it is not committed merely by breaching the contract, even if such act is intentional." *Id.* (citing 22 Am.Jur. *Damages* § 752 (1988)).

It may be conceded that tort usually signifies a breach of legal duty independent of contract. But such breach of duty may arise out of a relation or state of facts created by contract. *Smith v. Weber*, 70 S.D. 232, 236, 16 N.W.2d 537, 539 (1944). As more recently stated: "Conduct which merely is a breach of contract is not a tort, but the contract may establish a relationship demanding the exercise of proper care and acts and omissions in performance may give rise to tort liability." *Kunkel v. United Security Ins. Co.*, 84 S.D. 116, 135, 168 N.W.2d 723, 733 (1969).

*Id.*

[¶ 19.] This independent tort doctrine has two functions, as described by the Indiana Supreme Court in *Vernon Fire & Casualty Insurance Co. v. Sharp*, 264 Ind. 599, 349 N.E.2d 173 (1976):

> First, it maintains the symmetry of the general rule of not allowing punitive damages in contract actions, because the punitive damages are awarded for the *tort*, not the contract. Secondly, *the independent tort requirement facilitates judicial review of the evidence by limiting the scope of review to a search for the elements of the tort*.

349 N.E.2d at 180 (second emphasis added). *See also Morrill v. Becton, Dickinson and Co.*, 747 F.2d 1217, 1222 (8th Cir.1984) (focusing its analysis on whether the evidence was sufficient to prove the elements of fraud).

[¶ 20.] South Dakota has recognized the independent tort doctrine. In South Dakota, punitive damages are codified in SDCL 21–3–2, which provides, in relevant part, as follows:

> In any action for the breach of an obligation *not arising from contract*, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, ... the jury, in addition to the actual damage, may give damages for the sake of example, and by way of punishing the defendant.

(1987) (emphasis added). This statute states that no punitive damages are available for a breach of contract obligation. The language of the statute clearly permits punitive damages, however, for a tort arising independent of the contract obligation, and when the damages are necessary to deter the wrongful conduct and to punish the defendant.

[¶ 21.] The independent tort doctrine was first applied by this Court in *Smith v. Weber*, 70 S.D. 232, 16 N.W.2d 537 (1944). In *Smith*, an aggrieved tenant brought suit against his landlord who had tried to force him out of his apartment by shutting off the tenant's heat, water and telephone services, causing debris from a remodeling job to destroy $1,500 of the tenant's personal property, and burning garbage in the building's furnace. *Id.* at 538. In upholding the award of punitive damages, this Court stated:

> It may be granted that an omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty. But such legal duty ... may spring from extraneous circumstances, not constituting elements of the contract as such, although connected with and dependent upon it, and born of that wider range of legal duty which is due from every man to his fellow, to *respect his rights of property* and person, *and refrain from invading them by* force or *fraud.* A tort may grow out of or make part of, or be coincident with a contract. The fact that there existed a contract between the plaintiffs and the defendant would not immune the latter from the penalty that is ordinarily visited upon tortfeasors.

*Id.* at 539 (quoting *Jones v. Kelly*, 208 Cal. 251, 280 P. 942, 943 (1929)) (emphasis added). Under the facts of this case, as determined by the jury, Citation clearly invaded the property rights of the plaintiffs by committing fraud.

[¶ 22.] Upon review, in order to reach this conclusion, we must first focus on whether a legal duty exists independent of the obligations under the contract. In *Smith*, this Court noted that although it "may be conceded that tort usually signifies a breach of legal duty independent of contract ... such breach of duty may arise out of a relation or state of facts created by contract[.]" *Id.* at 539 (citations omitted). The existence of a legal duty is a question of law. *Fisher*, 1997 SD at 8 ¶ 13, 558 N.W.2d at 867 (citing *Tipton v. Town of Tabor*, 538 N.W.2d 783, 785 (S.D.1995)). We review questions of law de novo. *Id.* In *Sundt* and *Fisher*, we found as a matter of law that no duty outside the contract existed to support their claims of negligence. *Sundt*, 1997 SD at 91 ¶ 10, 566 N.W.2d at 479; *Fisher*, 1997 SD at 8 ¶ 16, 558 N.W.2d at 868. This case is a different story. We hold Citation had a duty to the plaintiffs which arose outside the contract obligation, namely, the "legal duty which is due from every man to his fellow, to respect his rights of property ... and refrain from invading them by ... fraud." *Smith*, 70 S.D. at 236, 16 N.W.2d at 539. Simply put, a contract is not a license allowing one party to cheat or defraud the other.

[¶ 23.] Having passed the first analytical hurdle of legal duty, we next focus on the existence (or nonexistence) of the independent tort alleged. Although the matters complained of may have "their origin in a contract, the gist of the action is for alleged wrongful and tortious acts of defendant." *Id.* We therefore put aside our review of the breach of contract cause of action and carefully analyze the evidence presented to determine whether each element of the alleged tort has been proven (recognizing that on appeal of a jury verdict, this Court is "required to view the evidence and all reasonable inferences from the evidence in the light most favorable to the verdict winner and conflicting evidence is to be resolved in favor of the verdict." *Nelson v. Nelson Cattle Co.*, 513 N.W.2d 900, 903 (S.D.1994)). If each element is present, then punitive damages may be properly awarded *for the tort.*[4] If any of the elements are absent, then no tort

---

4. We note at this juncture that there can be no double recovery of damages, *Ripple v. Wold*, 1996 SD 68, ¶ 7, 549 N.W.2d 673, 674–75, and the plaintiffs are required to prove fraud damages separate and distinct from the breach of contract damages. In the instant case, however, because there were no special interrogatories requested or submitted to the jury, we cannot ascertain how the jurors arrived at the separate damages of $222,850 for breach of contract and $354,250 for fraud. *See Miller v. Hernandez*, 520 N.W.2d 266, 272 (S.D.1994) (Sabers, J. dissenting); *Stormo v. Strong*, 469 N.W.2d 816, 825, (S.D.1991) (encouraging the submission of special interrogatories to jury regarding the amount awarded for each element of damages as a method for eliminating confusion over calculation of the types of damages awarded and aiding in meaningful appellate review).

has been committed, and the aggrieved party is left with only a breach of contract action, for which no punitive damages are available.

[¶ 24.] In this case, the plaintiffs allege that Citation's actions constitute the tort of deceit. The essential elements of deceit are:

[T]hat a representation was made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made; that it was made with the intent to deceive and for the purpose of inducing the other party to act upon it; and that he did in fact rely on it and was induced thereby to act to his injury or damage.

*Holy Cross Parish v. Huether,* 308 N.W.2d 575, 576 (S.D.1981). *See also S.W. Croes Family Trust v. Small Bus. Admin.,* 446 N.W.2d 55, 57 (S.D.1989); *Dahl v. Sittner,* 474 N.W.2d 897, 900 (S.D.1991).

[¶ 25.] The evidence presented at trial supports the conclusions that (1) representations of fact were made by Citation; (2) that such representations were untrue; (3) that Citation either knew the representations were untrue or made them recklessly; (4) that Citation made such representations with the intent to deceive the plaintiffs, and induce them to act (or in this case, not act) upon them; and (5) that the plaintiffs did in fact rely on Citation's false representations and were induced to pay excessive nonconsent penalties and to allow Citation to continue as operator.[5]

[¶ 26.] We believe there is a policy underpinning our conclusion that punitive damages are appropriate here upon a finding of deceit. We agree with the reasoning of the North Carolina Supreme Court in *Oestreicher v. American National Stores Inc.,* 290 N.C. 118, 225 S.E.2d 797, 809 (1976):

In the so-called breach of contract actions that smack of tort because of the fraud and deceit involved, we do not think it is enough just to permit defendant to pay that which the . . . contract required him to pay in the first place. If this were

the law, defendant has all to gain and nothing to lose. If he is not caught in his fraudulent scheme, then he is able to retain the resulting dishonest profits. If he is caught, he has only to pay back that which he should have paid in the first place.

To hold otherwise would give parties to a contract a license to steal, undercutting one of the very policy reasons for *withholding* punitives, i.e., to "encourage reliance on business agreements." *Supra,* ¶ 17. The twin purposes of punitive damages—deterrence and punishment—are well served in a contract where one party commits an intentional tort like deceit.

[¶ 27.] We have in the past awarded punitive damages for fraudulent inducement of a contract. *Ducheneaux v. Miller,* 488 N.W.2d 902 (S.D.1992). *Hoffman, supra.* Some courts have held that punitive damages for deceit in a contract are only available when the fraud was used to induce the contract. *See, e.g., Parks v. City of Marshalltown,* 440 N.W.2d 377 (Iowa 1989) (adopting test under *Pogge v. Fullerton Lumber Co.,* 277 N.W.2d 916 (Iowa 1979)); *United States ex rel. Farmers Home Admin. v. Redland,* 695 P.2d 1031 (Wyo.1985); *Las Palmas Assocs. v. Las Palmas Ctr. Assocs.,* 235 Cal.App.3d 1220, 1 Cal.Rptr.2d 301 (1991). This Court made no such distinction in *Hulstein v. Meilman Food Industries,* 293 N.W.2d 889 (S.D.1980), a case with facts strikingly similar to those now before this Court. In a contract for purchase of cattle, where the contract price was based on the cattle grades, Meilman deliberately underreported the grades at which the cattle had been sold, concealed its underreporting, denied wrongdoing, and "lost" the sale records. *Id.* at 892. In that case, we held that the trial court had properly instructed the jury that there must be a finding of fraud before punitives could be awarded. *Id.* This fraudulent behavior in *Hulstein* occurred during the contract, rather than at its inception, and punitive damages were awarded and affirmed. *See also Oestreicher,* 225 S.E.2d at

---

5. We note that the plaintiffs did not need to prove this fifth element under the law of the case doctrine raised by Issue 2, *infra,* ¶ 28.

809 (involving the intentional understatement of the percentage of monthly net sales which American National agreed to pay as part of its lease agreement). We find no reason at this point in time to draw a new distinction between fraud in the inducement and a fraud committed during contract performance, since the defrauded party is damaged regardless of when the fraud occurred.

[¶ 28.] **2. Was the jury properly instructed on the elements of deceit?**

▮▮▮▮▮ [¶ 29.] Citation argues that Instruction Number 20,[6] which set forth the elements of fraud, misstated the law by failing to include the element of reliance. SDCL 15–6–51(b) governs procedures for settlement of jury instructions at trial. It provides, in relevant part:

> [E]ach counsel, or party, shall specify and state the particular ground or grounds upon which the giving or rejecting of any instruction is objected to. It shall be insufficient to state generally that an instruction does or does not state the law, but it shall be necessary to specify clearly wherein any instruction, or part thereof objected to, is insufficient or does not state the law.... No grounds of objection to the giving or the refusing of an instruction shall be considered either on motion for new trial or appeal, unless presented to the court upon the "settlement" of such instruction.

The party objecting to an instruction must make the objection clear so the trial court is not only advised of possible errors, but also given an opportunity to correct the instructions accordingly. *Knudson v. Hess,* 1996 SD 137, ¶ 11, 556 N.W.2d 73, 77 (1996). Citation did not give the trial court this opportunity. At trial, Citation objected to the fraud instruction on the ground that it was not supported by the evidence. On appeal,

Citation claims the instruction was erroneous on the new ground that the instruction was a misstatement of the law. When a party's objection at trial is not the same as its objection on appeal, the issue of the improper jury instruction is not preserved for our review. *Sybesma v. Sybesma,* 534 N.W.2d 355, 359 (S.D.1995); *Hogg v. First Nat'l Bank of Aberdeen,* 386 N.W.2d 921, 925 (S.D.1986). "[T]he complaining party must have properly objected to the instruction in order to preserve the issue on appeal, or the improper instruction becomes the law of the case." *Knudson,* 1996 SD at 137 ¶ 11, 556 N.W.2d at 77; *Wallahan v. Black Hills Elec. Co-op.,* 523 N.W.2d 417, 419–20 (S.D.1994); *State v. Willis,* 370 N.W.2d 193, 200 (S.D.1985); *Shaull v. Hart,* 327 N.W.2d 50, 53 (S.D.1982). Because Citation failed to properly object to the jury instruction, the given instruction is the law of the case, and Citation has failed to preserve the issue for appeal.

[¶ 30.] **3. Did the trial court err in providing the jury with a "global" punitive damages form?**

▮▮▮ [¶ 31.] Citation argues that the trial court erred in providing the jury with a "global" punitive damages award in favor of plaintiffs, as opposed to a verdict form specifying the amount due each plaintiff. Citation failed to object to the use of this verdict form at trial.

▮▮▮ [¶ 32.] "Verdict forms to be submitted to the jury should be treated in the same manner as jury instructions to be submitted.... Similarly, at [the] instruction conference parties should object to any errors of commission or omission in the verdict forms to be submitted to the jury." *Hiway 20 Term., Inc., v. Tri–County Agri–Supply, Inc.,* 235 Neb. 207, 454 N.W.2d 671, 675 (1990); *see also Walsh v. Wild Masonry Co.,*

---

**6.** Instruction Number 20 provided, in relevant part, as follows:

In this action, the plaintiffs have the burden of proving the following issues:

*Fraud*

That Citation, with intent to deceive the plaintiffs in this action:

  a. Suggested as a fact that which was not true, and that which citation did not believe to be true;

  b. That Citation suppressed facts which were true, and Citation had knowledge or belief of the facts suppressed;

  c. That Citation made a promise without any intention of performing it; or

  d. That Citation committed any other act designated to deceive the plaintiffs.

*Inc.,* 72 Wis.2d 447, 241 N.W.2d 416, 420 (1976) (defendant who did not submit proposed verdict to the judge for approval and did not object to the form of the verdict as submitted by plaintiff waived any objection to the form of the verdict). By failing to raise an objection to the verdict form which would alert the trial court to the claimed error, Citation has failed to preserve this issue for appeal. *See Hogg,* 386 N.W.2d at 925.

**[¶ 33.]  4.  Were the punitive damages unreasonable and excessive as a matter of law?**

[¶ 34.] Citation next argues that the punitive damages award is unreasonable and excessive, and should therefore be set aside. We agree.

[¶ 35.] The jury awarded punitive damages of $4.8 million against Citation. Prior to this case, the largest punitive damages award ever imposed against a single defendant, subsequently challenged on appeal as excessive and affirmed as reasonable by this Court, was $750,000. *See Schaffer v. Edward D. Jones & Co.,* 1996 SD 94, 552 N.W.2d 801 (*Schaffer II* ).

■■■■ [¶ 36.] At the outset of our analysis, we admit there is no even playing field, as this Court gives the benefit of the doubt to the jury's verdict.

We have consistently held that the determination whether to award punitive damages and the amount rests in large part with the jury.

Great latitude is allowed in the class of cases. One purpose of exemplary damages is to deter the person against whom they are awarded from repeating the offense and others from committing it. An amount sufficient to serve this purpose in one instance might be wholly inadequate in another. Each action must be governed by its own peculiar facts. [A]ll circumstances are to be considered. The question is not whether the trial court or this court, as triers of

fact, would have awarded a less amount. Unless the verdict is so large as to clearly indicate that it must have been given under the influence of passion or prejudice, it should stand. *Stene v. Hillgren,* 78 S.D. 1, 98 N.W.2d 156, 159 (1959) (quoting *Bogue* [*v. Gunderson* ], 30 S.D. 1, 137 N.W.2d [595] at 596 [ (S.D. 1912) ] ).

This obviously creates an extremely difficult burden for anyone attempting to overturn a jury verdict on the ground of excessive damages. *Wangen v. Knudson,* 428 N.W.2d 242, 245 (S.D.1988).

*Schaffer II,* 1996 SD at 94, ¶ 26, 552 N.W.2d at 809–10. However, we will not uphold punitive damage awards that are oppressive or so large as to shock the sense of fairminded persons. *Hulstein,* 293 N.W.2d at 892. *See also Hannahs v. Noah,* 83 S.D. 296, 158 N.W.2d 678 (1968); *Stene v. Hillgren,* 78 S.D. 1, 98 N.W.2d 156 (1959).

■■■ [¶ 37.] To guarantee uniformity in the application of the law, we have established a five-factor test to determine whether a punitive damage award is appropriate or excessive. *Flockhart v. Wyant,* 467 N.W.2d 473, 479 (S.D.1991). Under this test we consider: (1) the amount allowed in compensatory damages, (2) the nature and enormity of the wrong, (3) the intent of the wrongdoer, (4) the wrongdoer's financial condition, and (5) all of the circumstances attendant to the wrongdoer's actions. *Id.*

■■■ [¶ 38.] The first factor to be considered is the amount of compensatory damages and its relationship or ratio to the amount of punitive damages. The amount of punitive damages must bear a reasonable relationship to the compensatory damages. *Centrol, Inc. v. Morrow,* 489 N.W.2d 890, 896 (S.D.1992). Here the jury awarded compensatory damages for fraud of $354,250 and punitive damages of $4.8 million for a ratio of 13 and one-half to one. While prior cases from this jurisdiction have upheld fractional awards equal to or even greater than occurred here,[7]

7. *See Hoff v. Bower,* 492 N.W.2d 912, 915 (S.D. 1992) (two punitive damage awards of $17,000 with compensatory damages of $639.45 and $623.45, ratios of 26½ to 1 and 27 to 1, respectively); *Davis v. Merrill Lynch, Pierce, Fenner & Smith,* 906 F.2d 1206 (8th Cir.1990) (Eighth Circuit Court of Appeals, applying South Dakota law; $2 million punitive damages based on com-

nevertheless, in *Schaffer II*, we cautioned that:

> Such ratio comparisons, however are of limited value. Were there to be some bright-line rule on ratios as Jones implies, the remaining four criteria would become irrelevant and the entire process of judicial review would be reduced to that of a turn at a calculator. We have held '[t]here is no precise mathematical ratio between compensatory and punitive damages.' *Wangen*, 428 N.W.2d at 246. Therefore, while this ratio [30 to 1] is cause for concern, we must proceed to analyze the other applicable factors to set the ratio matter in perspective.

*Schaffer II*, 1996 SD at 94 ¶ 28, 552 N.W.2d at 810–11.

[¶ 39.] The second factor is the nature and the enormity of the wrong. Here the expertise of the two parties becomes worthy of note when compared to our prior case law on fraud and deceit. *Schaffer II* was also a case based on a compensatory award for deceit. We stated in *Schaffer II* that a factor in upholding the substantial punitive damage award was the deceit of the defendant brokerage firm in selling securities to the plaintiff, who was a farmer with an eighth grade education and unsophisticated in these types of investments. *See Schaffer I*, 521 N.W.2d 921 (S.D.1994); *see also Davis v. Merrill Lynch*, 906 F.2d 1206, 1210 (8th Cir.1990) (affirming a $2 million punitive damage award to an "unsophisticated investor who completely trusted [her broker] and relied upon his advice"); *Holmes v. Wegman Oil*, 492 N.W.2d 107 (S.D.1992) (a punitive damage award of $500,000 each to five plaintiffs for fraudulent concealment by a manufactur-

er of a defective LP valve; victims had no knowledge of the defect and were severely injured by an explosion caused by the defect); *Hoff v. Bower*, 492 N.W.2d 912 (S.D. 1992) (painters in Aberdeen were awarded punitive damages against painting contractor for fraudulent representation for being lured to California by promises of high wages and excellent working conditions when "it appears from the transcript that nearly every promise made to these two men [the plaintiffs] was a lie.")

[¶ 40.] The case now before us pits plaintiffs, who are all sophisticated, experienced oil and gas operators or investors, against the expertise of the defendant. The plaintiffs were well familiar with the oil drilling business and JOAs,[8] contrary to the investor in *Schaffer I & II*, who knew nothing about the risks in investing in limited partnerships.

[¶ 41.] In considering punitive damage awards, the United States Supreme Court in *BMW of North America, Inc., v. Gore* further focused on the "likely potential harm" to a plaintiff as a result of the defendant's fraudulent acts. 517 U.S. ——, ——, 116 S.Ct. 1589, 1599, 134 L.Ed.2d 809, 830 (1996). As far as the specifics of the enormity of the wrong perpetrated upon the plaintiffs in the case now before us, they informed this Court that they stood to lose approximately $165,-000 per year in overcharges.[9] At that rate, the punitive damages awarded in this case represent over 29 years of "potential additional harm" to the plaintiffs. Yet the life expectancy of the wells generating those overcharges was five years or less. Thus, plaintiffs' potential loss could not exceed

---

pensatory award of $100,000, a ratio of 20 to 1); *K & E Land and Cattle, Inc. v. Mayer*, 330 N.W.2d 529, 532 (S.D.1983) ($7,000 punitive damages based on compensatory award of $199.60, a ratio of 35 to 1); *Hulstein*, 293 N.W.2d at 892 ($50,000 punitive damage verdict with compensatory damages of $4,574, a ratio of 11 to 1).

**8.** Plaintiff, Grynberg has been described by various appellate courts as an "oil well operator," *Bellet v. Grynberg*, 114 N.M. 690, 845 P.2d 784, 785 (1992); "a petroleum and geophysical engineer who has organized several natural resource investment companies," *Lloyd v. Grynberg*, 464

F.2d 622, 623 (10th Cir.1972); an "experienced, sophisticated, intelligent business[man] with vast education and experience in petroleum engineering, … oil and gas exploration, and … [the] makeup and operation of oil drilling rigs and equipment[.]" *Universal Drilling & Grynberg v. Camay Drilling*, 737 F.2d 869, 870 (10th Cir. 1984); and "sophisticated international businessman[.]" *Klein v. Grynberg*, 44 F.3d 1497, 1500 (10th Cir.), *cert. denied*, 516 U.S. 818, 116 S.Ct. 58, 133 L.Ed.2d 22 (1995).

**9.** "By its deceptive scheme, Citation was improperly profiting at a rate of almost $165,000 per year." Plaintiffs' brief p. 68.

$825,000 during the lifetime of the wells, even using their own figures.

[¶ 42.] The third factor is that of the wrongdoer's intent. "From intent, we determine 'the degree of reprehensibility of the defendant's conduct,' which is viewed as probably the most important indication of reasonableness of a punitive damage award." *Schaffer II*, 1996 SD at 94 ¶ 32, 552 N.W.2d at 812 (citing *BMW*, 517 U.S. at ——, 116 S.Ct. at at 1599, 134 L.Ed.2d at 826). Trickery and deceit are more reprehensible than negligence. *Id.*[10] Of a more serious nature would be those acts which result in injury to persons through "indifference to and reckless disregard for the health or safety of others." *See BMW*, 517 U.S. ——, 116 S.Ct. at 1599, 134 L.Ed.2d at 826. The most reprehensible, from an intent point of view, would be an intentional malicious assault or attack against a person. *Id. See Shippen v. Parrott*, 1996 SD 105, 553 N.W.2d 503 (*Shippen II* ); *Zahrowski v. Dahl*, 78 S.D. 255, 100 N.W.2d 802 (1960); *Stene, supra*.

[¶ 43.] Cases where the defendant or its operating officers knew or committed the deceit are more reprehensible than cases involving punitive liability based on respondeat superior where the misdeeds were committed by employees whose acts were unknown to corporate leadership. *Schaffer II*, 1996 SD at 94 ¶ 34, 552 N.W.2d at 812. Here Citation makes no claim of respondeat superior as a partial defense for being held responsible for wrongful acts committed upon the plaintiffs. The evidence indicates that the acts were deceitfully and intentionally done by Citation against the plaintiffs for the purpose of enriching Citation.

[¶ 44.] The fourth factor is the consideration of the financial condition of the wrongdoer. In *Schaffer II*, we analyzed this factor by a review of the defendant's net worth and net income, 1996 SD at 94 ¶¶ 36–37, 552 N.W.2d at 813. We noted the punitive verdict awarded less than one-half of one percent of the net worth of the defendant, and based on its income, it could make up the loss of the award with between four to twenty hours of net income. *Id.* n. 18.

[¶ 45.] In contrast, in the case now before us, the punitive award has a much greater effect on the defendant. It constitutes ten percent of the defendant's entire net worth. *Cf. Hoff*, 492 N.W.2d at 915 (upholding an award equal to two percent of the defendant's net worth). More significantly, the punitive damage award would represent all of Citation's net income for an entire year, despite the fact this case is a dispute over only seven of the 3,000 wells (one-half of one percent) Citation operates. *Cf. Hoff*, 492 N.W.2d at 915 (where the award was three percent of the defendant's gross income). There is no case law in this jurisdiction which even approaches upholding an award that would have this kind of an effect on a defendant.[11]

---

**10.** Punitive damages are not available for most negligence actions. *Yankton Prod. Credit Ass'n v. Jensen*, 416 N.W.2d 860, 863 (S.D.1987). Under SDCL 21–3–2, there must be oppression, fraud or malice. *Dahl v. Sittner*, 474 N.W.2d 897, 900 (S.D.1991). Malice may be actual malice, as evidenced by an intention to injure another, actuated by hatred or ill-will towards that person; or presumed or legal malice, which is imputed by a person who acts willfully or wantonly to the injury of another. *Id.*

**11.** The dissent takes issue with this conclusion by citation to *Flockhart v. Wyant*, 467 N.W.2d 473, 479 (S.D.1991), where it points out this Court upheld a punitive verdict of $30,000 against a Defendant who only had an annual income of $2,400. However, a reading of *Flockhart* shows that the extent of the Defendant's assets was never established. At a minimum she was a co-owner of a home. In addition this Court held: "Wyant is approximately fifty years of age, and chooses to work only a few hours each week. Wyant's husband supports her and provides for all the necessities of her life." 467 N.W.2d at 479. In other words, Wyant was getting a free ride financially through life, in addition owned an unknown amount of assets and only worked part time to get money to supply her alcohol addiction which was the source of the accident which resulted in personal injury to Flockharts. Whether Wyant's interest in her home could be taken from her to satisfy the judgment is doubtful. *See* SDCL ch 43–31 "homestead exemption." In reality, the greatest potential effect of the verdict on Wyant would be to deny her discretionary money for liquor. Beyond that, her totally supported life-style would not be affected. In contrast, in the case now before us there is no evidence in the record to suggest that Citation's assets and income were subject to the same type of subsidies as was Wyant.

[¶ 46.] The final factor is a consideration of all the other relevant circumstances of this case. In *Schaffer II*, we focused on two concerns. One was the availability of other sanctions, including those under our criminal code. Here plaintiffs argue that Citation's acts "are 'comparable' to theft by deception under SDCL 22–30A–3 or theft by embezzlement under SDCL 22–30A–10." In discussing these statutes in *Schaffer II*, we noted that criminal penalties included a maximum ten-year penitentiary sentence, a $10,000 fine or both. 1996 SD at 94 ¶ 39, 552 N.W.2d at 814. *See* SDCL 22–6–1. Restitution is authorized under SDCL 23A–28–2(3), but is limited to pecuniary damages and specifically excludes punitive damages.[12] There is no evidence in the record to show any criminal charges are pending or even contemplated.

[¶ 47.] *BMW* teaches us to consider whether a less drastic remedy could achieve the goal of deterring future misconduct. 517 U.S. at ——, 116 S.Ct. at 1603, 134 L.Ed.2d at 832. Applying this rationale in *Schaffer II*, we found that a lesser amount would not suffice given the defendant's challenge to the jury that "we would do it again." 1996 SD at 94 ¶ 42, 552 N.W.2d at 814. No such position is advanced by Citation in this case.

[¶ 48.] In summary, the factors show that Citation is guilty of deceit, which is condemned by statutes of this State and the decisions of this Court. Cases from this jurisdiction and others can be cited to show greater ratios being affirmed for the sake of punishing a defendant. However, here the punitive award is five times in excess of what the plaintiffs would have ever lost even if Citation's actions went undetected throughout the lifetime of the wells. Moreover, the award represents a substantial amount of Citation's net worth and would result in the loss of an entire year's profits for actions involving less than one-half of one percent of the wells which it supervises.

[¶ 49.] Even with giving the jury's verdict the deference to which it is entitled, under our five-factor test, we conclude that the punitive award was shockingly excessive [13] and oppressive.[14] It clearly goes against one's sense of fairness and sympathy to listen to the pleas of a party who has been found guilty of deceit. Nevertheless, the

---

**12.** Plaintiffs advanced this point in their brief and thus we address it. The dissent's extensive discussion of the purported effect of 18 USC 1341 (mail fraud) and 18 USC 1962–1964 (RICO or racketeering activity) was never briefed nor argued to this Court by any party as applicable. As such we do not address it.

**13.** The award of any punitive damages was subject to dispute. The jury was not unanimous on the award, as two jurors would not have awarded any punitive damages. Had one more juror dissented from the award, a hung jury would have resulted on this issue. SDCL 15–14–25.

**14.** Excessive punitive damages are now firmly held to carry constitutional implications. Such damages may not be in excess of that which is "reasonably necessary to punish and deter." *Schaffer II*, 1996 SD at 94 ¶ 50, 552 N.W.2d at 815 (citing *Pacific Mutual Life Ins. Co. v. Haslip* 499 U.S. 1, 22, 111 S.Ct. 1032, 1046, 113 L.Ed.2d 1, 23 (1991)). "Damages awarded in excess of that criteria amount to an 'arbitrary deprivation of property.' " *Id.* (citing *Honda Motor Co. v. Oberg*, 512 U.S. 415, 430–432, 114 S.Ct. 2331, 2340, 129 L.Ed.2d 336, 349 (1994)). The due process clause of the Fourteenth Amendment prohibits a state from imposing a "grossly excessive" punitive punishment on the tortfeasor. *Id.*

(citing *BMW*, 517 U.S. at ——, 116 S.Ct. at 1592, 134 L.Ed.2d at 818). The net worth of the tortfeasor is one of the typical factors to be considered in determining the constitutional reasonableness of the award. *Id.* at ¶ 50, at 816 (citing *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 462 n. 28, 113 S.Ct. 2711, 2722 n. 28, 125 L.Ed.2d 366 n. 28 (1993)).

In upholding the punitive verdict from constitutional attack in *Schaffer II*, we observed that "this is not a case where the award will destroy or even seriously damages Jones."
"Punitive damages should bear a reasonable relationship to the harm *that is likely to occur from the defendant's conduct* as well as the harm that actually has occurred. If the defendant's actions cause *or would likely cause* in a similar situation only slight harm, the damages should be relatively small. If the harm is grievous, the damages should be greater[.]" It is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred.
*Id.* at ¶ 51, 552 N.W.2d at 816 (citing *TXO*, 509 U.S. at 460–61, 113 S.Ct. at 2721–22, 125 L.Ed.2d at 380–81 (emphasis original)).

purpose of punitive damages is to punish, not to permanently cripple or destroy.

[¶ 50.] As was procedurally approved in *Shippen II,* after a consideration of "all relevant factors," we reduce the punitive damages award to one million dollars. This figure exceeds the maximum potential financial loss to the Plaintiff of $825,000 and thus the maximum potential gain to the Defendant. It is well in excess of the compensatory verdict of $577,100 awarded by the jury.[15] Per *Shippen II,* the plaintiffs should be given the option to accept this remittitur together with interest thereon, or if not acceptable, be granted a new trial on the issue of punitive damages. Plaintiffs are given 30 days from the date of this opinion to make this election.

[¶ 51.] MILLER, C.J., concurs.

[¶ 52.] SABERS and AMUNDSON, JJ., concur in part and dissent in part.

[¶ 53.] TUCKER, Circuit Judge, dissents.

[¶ 54.] TUCKER, Circuit Judge, sitting for KONENKAMP, J., disqualified.

SABERS, Justice (concurring in part & dissenting in part).

[¶ 55.] I join Judge Tucker's dissent.

[¶ 56.] I write separately to point out the inconsistency between the majority opinion and the majority writer's prior opinion in *Schaffer II* regarding punitive damages.

[¶ 57.] The majority opinion relies excessively on Grynberg's sophistication as an oil well operator. He is only one of eleven plaintiffs. Is his sophistication to be imputed to the others? Were they all so experienced and sophisticated? More importantly, what

possible relevance does that have to this case? This case differs from *Schaffer II* because Citation repeatedly and deliberately lied, falsified records, and overcharged the well owners. "Schaffer was an unsophisticated investor in limited partnerships" and the defendant "owed Schaffer a duty of properly informing Schaffer of the risks [defendant] knew to be involved with this investment." 1996 SD at 94 ¶ 31, 552 N.W.2d at 811. If Grynberg were a novice in the oil business, would Citation owe a duty to disclose its practiced deception? Of course not. Does Grynberg's sophistication reduce damages resulting from Citation's duplicitous and deceitful behavior? Of course not. The majority opinion is rewarding Citation because its victims were sophisticated. This is a $3.8 million dollar windfall to Citation. A plaintiff's sophistication should not be a mitigating factor in a case of fraud and deceit such as this.

[¶ 58.] The majority opinion pays lip service to the punishment and deterrence aspect of punitive damages. *See supra* ¶ 47. SDCL 21–3–2 provides:

In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, or in any case of wrongful injury to animals, being subjects of property, committed intentionally or by willful and wanton misconduct, in disregard of humanity, the jury, in addition to the actual damage, may give *damages for the sake of example, and by way of punishing the defendant.*

(Emphasis added); *see also Schaffer II,* 1996 SD at 94 ¶ 25, 552 N.W.2d at 809:

enough to cause that individual not to repeat wrongful action in the future especially where the potential financial rewards do not come close to equaling that amount?

As far as being "relatively large," $1,000,000 is the largest punitive verdict ever affirmed by this Court when challenged as excessive and exceeds the previous high amount of 25% or $250,000. See *Schaffer II.* If this be mere "lip service to the punishment and deterrence aspect of punitive damages," as hypothesized by the dissent, what of all our substantial prior case law on the subject?

---

15. We are at a loss to construe a $1,000,000 punitive verdict on top of a compensatory verdict of $577,100 as a "windfall" to Citation who has to pay that amount. The $1,000,000 punitive verdict as reduced by this Court still amounts to one-fourth of Citations income for an entire year. If a business or individual were slapped with a penalty amounting to 25% of their annual income on top of a compensatory or property loss of half again that amount, would they find it a "windfall" as suggested by the dissent or a "substantial" and "relatively large" penalty as determined by a majority of this Court. Is a loss of approximately 37½% of one's annual income

SDCL 21–3–2 describes the nature of the award to be "for the sake of example, and by way of punishing the defendant." This has been our *consistent* approach in examination of these types of awards since *Richardson v. Huston*, 10 S.D. 484, 74 N.W. 234 (1898). Punitive damage awards extend not only to act as punishment for the individual defendant for past tortious acts and deter the defendant from repetition, *Bogue v. Gunderson*, 30 S.D. 1, 137 N.W. 595, 596 (1912), but also to serve notice to others who would be tempted to repeat such actions in the future, that they do so at their *substantial* peril. *Hulstein v. Meilman Food Industries*, 293 N.W.2d 889, 892 (S.D.1980). To accomplish these purposes, the punitive damages must be "*relatively large.*" *Id.*

(Emphasis added) (footnote omitted). Citation engaged in a pattern of fraudulent and deceitful conduct over a period of approximately seven years. Surely that merits a "substantial" and "relatively large" punitive damages award. *Accord BMW of North America, Inc. v. Gore*, 517 U.S. 559, ——, 116 S.Ct. 1589, 1599–1600, 134 L.Ed.2d 809, 827 (1996):

> Certainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law. Our holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance.

(Citations omitted).

[¶ 59.] The trial court properly instructed the jury on the law of punitive damages by setting forth the five factors we consider when reviewing a punitive damages award. "Juries are presumed to follow the instruc-

tions of the trial court." *State v. Eagle Star*, 1996 SD 143, ¶ 22, 558 N.W.2d 70, 75 (citation omitted); *see also First Nat'l Bank of Minneapolis v. Kehn Ranch, Inc.*, 394 N.W.2d 709, 720 (S.D.1986) ("It is, of course, presumed that the jury understood and abided by these instructions."). This punitive damage award was arrived at fairly and legally. It is "substantial" and "relatively large," as it *must* be to achieve the desired goals of punishment and deterrence. *Schaffer II, supra.* That fact does *not* constitute grounds for remittitur. Nor does it "permanently cripple or destroy" Citation as the majority opinion implies (*supra* ¶ 49). Accordingly, we should affirm rather than reverse the jury's award.[16]

AMUNDSON, Justice (concurring in part and dissenting in part).

[¶ 60.] I dissent on Issue One.

[¶ 61.] In order to maintain a cause of action for fraud in addition to breach of contract, "the fraud must be extraneous to the contract, rather than a fraudulent non-performance of the contract itself." *Bevins v. King*, 147 Vt. 203, 514 A.2d 1044, 1045 (1986) (citations omitted). The significance of this distinction is outlined in *Bevins*

> [P]rinciples of contract and principles of fraud must be kept separate and distinct for "[i]f every broken promise were to constitute fraud, ... the resulting instability would severely impair the conduct of business." *See also Hertz Commercial Leasing Corp. v. LMC Data, Inc.*, 73 Misc.2d 1009, 1013, 343 N.Y.S.2d 689, 694 (Civ.Ct.1973) ("If a party could simply, by alleging that a contracting party never intended to fulfill his promise, create a tortious action in fraud, there would be no effective way of preventing almost every contract case from being converted to a tort for jurisdictional purposes.")

---

**16.** While a bright-line mathematical formula is not determinative of punitive damages, the ratio may be even closer in this case than stated. The majority opinion points out that if Citation's deceit had gone undetected, the maximum amount of loss the plaintiffs could have sustained was $825,000. *Supra* ¶ 41. The relationship between the punitive damage award of $4.8 million and that figure is 5.8 to 1 rather than 13.5 to 1. *See BMW*, 517 U.S. at ——, 116 S.Ct. at 1602, 134 L.Ed.2d at 830 (discussing with approval the comparison of punitive damages with "*the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred.") (emphasis in original) (citation omitted).

*Id.* at 1046 (citing *Union Bank v. Jones,* 138 Vt. 115, 411 A.2d 1338, 1343 (1980)).

[¶ 62.] In this case, a duty must exist outside of the contractual relationship in order for the plaintiffs (collectively referred to as Grynberg) to create an independent action for fraud. A party cannot convert a breach of contract cause of action into a tort merely by stating it as such. We recently upheld settled law in this state in *Fisher Sand & Gravel v. State.*

> "Tort obligations are in general obligations that are imposed by law on policy considerations to avoid some kind of loss to others. They are obligations imposed apart from and independent of promises made and therefore apart from any manifested intention of parties to a contract or other bargaining transaction. Therefore, if the alleged obligation to do or not to do something that was breached could not have existed but for a manifested intent, then contract law should be the *only* theory upon which liability would be imposed."

1997 SD 8, ¶ 14, 558 N.W.2d 864, 867–68 (quoting Prosser & Keeton on Torts § 92, at 656 (5th ed. 1984)) (emphasis in original). The majority attempts to transform Grynberg's action for breach of contract into an action for fraud by stating the bases for the independent fraud action are false factual representations made by Citation with the intent to deceive Grynberg. ¶¶ 21, 25, *supra.* However, the Joint Operating Agreements (JOAs) include the promise to adjust the joint account pursuant to the TIPCO audit as well as a promise to step down as operator. Therefore, the JOAs impliedly create the obligation to make true factual representations to Grynberg. There is no duty outside of this contractual duty clearly defined in the JOAs. *See, e.g., Fisher Sand & Gravel,* 1997 SD at 8, ¶ 18, 558 N.W.2d at 868–89 (stating, "In order to maintain its tort claim against [defendant], [plaintiff] must show [defendant's] acts or omissions resulted in the breach of an independent duty not already defined by the contract.") Grynberg even admits "[t]he JOAs define the relationship and duties of the parties." Plaintiffs' Brief on Partial Summary Judgment/Defendants Failure to Keep Adequate Accounting Records, at 4–5. The trial court agreed, stating, "[T]he relationship between the parties to the [JOAs] is controlled by the terms of their agreement voluntarily made.... [T]he JOAs specifically defined the standard by which the operator's conduct is measured."

[¶ 63.] A similar situation occurred in *Brick v. Cohn–Hall–Marx Co.,* wherein the plaintiff alleged the "defendant kept false books, rendered false statements, and made sales for which it did not account." 276 N.Y. 259, 11 N.E.2d 902, 903 (1937). In an action for fraud, the plaintiff sought damages in the form of contract royalties which were not paid due to the defendant's conduct. The court held the plaintiff's action sounded in contract, stating:

> [I]f the defendant owes the plaintiff any money, it is because of the agreement which it made to pay royalties upon sales which were made. Even though the defendant may have falsely stated the amount of the sales and rendered false statements, the fact remains its liability on the actual amount of sales depends upon the contract. Whether the defendant deliberately refused to make payment, thus breaching its contract, or whether through neglect it made false statements, or whether it deliberately made false statements, the action of the plaintiffs is founded and based upon the contract, without which they would have no claim at all. The falsity of these statements and the fraud of the defendant according to the allegations amounted to a breach of the contract and were no more or less a breach of the contract then if the defendant had deliberately refused to pay or had neglected to pay.

*Id.* at 904. *See also Wood & Locker, Inc. v. Doran & Assoc.,* 708 F.Supp. 684, 689 (W.D.Pa.1989) (holding a contract cause of action involving operating agreements is not converted to a fraud cause of action when the plaintiff's injury is recoverable in the contract action).

[¶ 64.] The majority cites *Vernon Fire & Casualty Insurance Co. v. Sharp,* 264 Ind. 599, 349 N.E.2d 173 (1976), a bad-faith insurance case, to support its theory that each element of fraud ought to be shown without reference to the breach of contract action in

order to determine whether an independent tort exists. Then, applying the elements of deceit, the majority concludes there are sufficient facts to support an independent tort in this case. Regarding the element of injury or damage, the majority states the plaintiffs were "induced to pay excessive nonconsent penalties and to allow Citation to continue as operator." ¶ 25, *supra*. Paying nonconsent penalties and allowing Citation to continue in its capacity, however, are damages arising solely from the breach of contract. As we stated in *Hoffman v. Louis Dreyfus Corp.*, "[t]he independent tort must be separate and distinct from the breach of contract." 435 N.W.2d 211, 214 (S.D.1989) (quoting 22 Am. Jur.2d § 752 (1988)). When contract and fraud claims are asserted, the critical distinction is whether the alleged fraud "occurred before or after the contractual relationship existed[.]" *Deutz & Crow v. State Cement Plant Comm'n*, 466 N.W.2d 631, 636–37 (S.D. 1991). If the fraud occurs before a contractual relationship is formed, an independent tort claim may exist. *Id.* at 637. However, if the fraud occurs after the parties enter into a contract, separate claims do not exist. *Id.* Clearly, each of Grynberg's allegations involve disputes which occurred *after* the contractual relationship was formed. No fraudulent inducement claims were alleged by Grynberg. Therefore, there are no separate tort claims.

[¶ 65.] Furthermore, the tort of fraud is not separate and distinct from the contract at hand when there are no injuries that arise from fraudulent conduct alone. For example, in *Textron Financial Corp. v. Nationwide Mutual Insurance Co.*, the Ohio Court of Appeals stated:

> In addition to containing a duty independent of that created by contract, an action arising out of contract which is also based upon tortious conduct must include actual damages attributable to the wrongful acts of the alleged tortfeasor which are in addition to those attributable to the breach of the contract.

115 Ohio App.3d 137, 684 N.E.2d 1261 (9 Dist.) (citations omitted). Likewise, in *Chachere v. Drake*, the Court of Appeals of Texas stated:

The mere joinder of a claim in contract with a claim in tort does not alter the fundamental rule: breach of contract cannot support the recovery of exemplary damages. It is well settled that a recovery of punitive damages requires a finding of an independent tort with accompanying actual damages. The mere availability of a tort-based theory of recovery is not sufficient; *actual damages sustained from an independent tort must be proven before punitive damages are available.*

941 S.W.2d 193, 197 (Tex.App.1996) (citations omitted) (emphasis added); *see also Quinn v. Workforce 2000, Inc.*, 887 F.Supp. 131, 136 (E.D.Tex.1995) (stating, "The nature of the injury most often determines which duty or duties are breached. When the injury is only the economic loss to the subject of the contract itself, the action sounds in contract alone.") (quoting *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617 (Tex.1986)); *Cornwell v. Jespersen*, 238 Kan. 110, 708 P.2d 515, 524 (1985) (stating the injuries suffered by the plaintiff flowed from the contract; therefore, the action for fraud was denied).

[¶ 66.] A review of the pleadings reveals the actual damages allegedly suffered by Grynberg include: recovery of lease operating expenses in excess of the amount they deemed to be reasonable under the JOAs; reimbursement for additional lease expenses charged to them by reason of the change of allocation method to a volumetric basis; and recovery of nonconsent penalties charged under the JOAs to specific parties. None of these damages consist of "actual damages attributable to the wrongful acts of [Citation] which are *in addition to* those attributable to the breach of the contract." *Textron Financial Corp.*, 115 Ohio App.3d 137 at 151, 684 N.E.2d 1261 at 1271 (emphasis added). Rather, each of these asserted damages is an economic loss incurred as a result of the breach of contract. Without separate actual fraud damages, punitive damages cannot be supported.

[¶ 67.] Therefore, I would reverse the tort damage award and remand with instructions to enter judgment on the fraud claim in favor of Citation.

[¶ 68.] I concur on Issue Four.

TUCKER, Circuit Judge (dissenting).

[¶ 69.] I agree with the majority's decision on Issues I, II, and III. With regard to Issue IV, I respectfully dissent.

[¶ 70.] The issue of punitive damages falls largely within the province of the jury, which is afforded a great deal of latitude in determining the amount of punitive damages, if any, to be awarded. *Schaffer v. Edward D. Jones & Co.*, 552 N.W.2d 801, 809 (S.D.1996). The question of damages is *strictly* a jury question. *Kamp Dakota, Inc. v. Salem Lumber Co., Inc.*, 89 S.D. 696, 237 N.W.2d 180 (S.D.1975) (citing *Rowan v. Becker*, 73 S.D. 273, 41 N.W.2d 836 (1950)) (emphasis added). Only in cases where the punitive damages award is oppressive or so large as to shock the conscious of fair-minded persons should the court "invade the sacred kingdom of the jury." *Hulstein v. Meilman Food Industries*, 293 N.W.2d 889, 892 (S.D.1980).

[¶ 71.] In making its determination that the jury verdict in this case is shockingly excessive and oppressive, the majority correctly uses the five factor determination that was set forth to give "guideposts" for judicial review. *Flockhart v. Wyant*, 467 N.W.2d 473, 479 (S.D.1991). The factors for this test are: (1) the amount allowed in compensatory damages, (2) the nature and enormity of the wrong, (3) the intent of the wrongdoer, (4) the wrongdoer's financial condition, and (5) all of the circumstances attendant to the wrongdoer's actions. *Id.* Upon analyzing these factors with the proper deference and comity to the jury's award, a result different than that of the majority seems to be required.

[¶ 72.] The first factor to be considered is the amount of compensatory damages and its relationship or ratio to the amount of punitive damages. Both parties' briefs quickly point out the vast range of ratios that have both survived and crumpled under the weight of judicial review. In footnote seven of the majority opinion, the Court lists several awards that were upheld. These awards range from a high of 35 to 1 to a low of 11 to 1. This case presents compensatory and punitive damage awards that yield a ratio of 13.5 to 1. The ratio of damages here is easily within bounds that the Court has found permissible on previous occasions. Even though a mathematical bright line is not used in determining the reasonableness of the ratio, and such ratio comparisons are of limited value, this case does not present the kind of ratio that "shocks the conscience." *Schaffer*, 552 N.W.2d at 810–11. In fact, an even higher ratio may be justified in cases in which the injury is difficult to detect. *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). Here, Citation utilized an involved scheme of deceit and trickery in order to hide their wrongdoing. Therefore, I would have to conclude that this factor does not sway in the direction of finding punitive damages oppressive.

[¶ 73.] The second factor is the nature and enormity of the wrong. In this case it is plain and simple what the wrong is: theft by fraud. Pursuant to prior case law, the majority takes this opportunity to examine the sophistication of the parties. While it is true that both plaintiffs and defendant had ample education and experience in the oil industry, I believe that the majority places too much emphasis on the plaintiff's intellect and not enough on the defendant's conduct and its magnitude. The defendant, through trust given by the plaintiffs, was stealing thousands and thousands of dollars. This despicable conduct should not be so easily outweighed by the status of the plaintiff's sophistication. In fact, the sophistication of the plaintiffs simply emphasizes the complexity of the fraud and the need for extensive punitive damages. The defendant should not be judicially relieved of a large punitive damages award because it and plaintiffs were skilled in the oil industry. Theft is theft. If the jury sought to punish the defendant for its conduct, we should appreciate that conclusion. Again, this factor is not tipped in defendant's favor.

[¶ 74.] The third factor that is considered is that of the wrongdoer's intent. This factor should focus on the degree of reprehensibility of the defendant's conduct. *Schaffer*, 552 N.W.2d at 812 (citing BMW, 517 U.S. at ——, 116 S.Ct. at 1599, 134 L.Ed.2d at 826). This factor is "perhaps the most important indicium of the reasonableness of a punitive

damages award." *Id.* The defendant was not only taking what it was not entitled to take, which is undoubtedly reprehensible, but was taking considerable efforts to affirmatively conceal or "make legitimate" its fraud using its position of power granted by the Joint Operating Agreements. Defendant was taking advantage of its control of plaintiff's property as well as taking advantage of plaintiff's belief that the operation was being run honestly. Deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive are factors that must be considered in favor of the plaintiffs. *BMW,* 517 U.S. at ——, 116 S.Ct. at 1601, 134 L.Ed.2d at 829.

[¶ 75.] The evidence shows that the defendant intentionally and repeatedly allocated improper costs against the plaintiff; intentionally charged higher penalties than allowed; provided the plaintiff with false pay-out reports; never credited funds to the plaintiffs despite saying it would do so; secretly changed the method of allocating the costs among the wells; and engaged in an on-going pattern of fraudulent conduct to conceal its improper actions. According to *BMW,* infliction of economic injury, especially when done intentionally through affirmative acts of misconduct can warrant a substantial penalty. *BMW,* 517 U.S. at ——, 116 S.Ct. at 1599, 134 L.Ed.2d at 827. Also, intentional malice can represent the decisive element in a "close and difficult case." *BMW,* 517 U.S. at ——, 116 S.Ct. at 1599, 134 L.Ed.2d at 827 (citing *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993)). Intentional malice by the defendant appears in statements such as, "I don't care what you do and we don't care what the Working Interest owners do either;" and, the working interest owners only remedy was to sue and that they could "go to hell." Grynberg's Brief id., pp. 18 and 23; Trial Transcript pp. 1661–1662 and 269, 915–916. As stated in *BMW,* the punishment should fit the crime.

*BMW,* 517 U.S. at ——, 116 S.Ct. at 1599, 134 L.Ed.2d at 826 fn. 24. Here, the defendant was taking so much that instead of making a profit on their oil wells, the plaintiffs were losing as much as $67,000 per year. Grynberg's Brief at p. 18. Unlike the majority, this dissenter can not say that the jury's determination to punish the defendant by taking away one year of its *own* profit is unjustified and shocking.[17] This third, and most important factor, does not favor reduction of the jury verdict.

[¶ 76.] The fourth factor is the consideration of the financial condition of the wrongdoer. Both net worth and net income are analyzed. *Schaffer,* 552 N.W.2d at 813. The defendant's net worth has risen from $43 million in 1992 to $48 million in 1994. Within two years, defendant has amassed a five million dollar increase in net worth. Defendant's net income is in excess of $4 million dollars per year. It is readily apparent that the defendant can pay the award. The jury must have believed this as well.

[¶ 77.] The majority's assertion that this Court has never upheld a punitive damages award that "would have this kind of an effect on a defendant" is in error. This Court has upheld a punitive damages award which constituted more than 1,200 percent of the defendant's annual net income, and would take her well over twelve years to pay if she committed her entire net income to paying the same.[18] *Flockhart v. Wyant,* 467 N.W.2d at 479. This Court has affirmed strong punitive damages against individuals; a corporation should not be treated preferentially. Again, this factor does not induce the "shock" required for reversal by this Court.

[¶ 78.] The fifth and final factor is a consideration of all the other relevant circumstances of the case. Under *Schaffer,* the two concerns that were examined were the availability of other sanctions and determining if a less drastic remedy could achieve the goal of deterring future misconduct. In the majority's review of possible other sanctions, it

---

17. The majority states that the punitive damages award would represent all of Citation's income for an entire year despite the fact that this case is a dispute over only seven of the 3,000 wells that Citation operates.

18. The jury assessed $30,000 in punitive damages against the defendant who earned approximately $2,400 at her part-time job.

recognizes the defendant's conduct as grand theft. Grand theft is committed when the value of the property stolen exceeds five hundred dollars, and can warrant the imposition of a $10,000 fine as well as a ten year prison sentence. SDCL 22–30A–17, 22–6–1. However, the South Dakota statutory scheme fails to differentiate between the criminal who steals $501 and the criminal who steals $5 million. The two criminals would face the same possible maximum sentence. This lack of distinction limits the magnitude in which the thief can be punished in a criminal context. Because of this distinction, I believe that a higher punitive damage award in the civil context is certainly justified when the thief steals an amount of money that so greatly exceeds $500.

[¶ 79.] Also, the majority seems to be looking at the defendant's conduct while wearing blinders. It appears that other charges could have easily been brought against the defendant. Both mail fraud and violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) are feasible when surveying the defendant's actions. Mail fraud, as defined in 18 U.S.C.A. § 1341, authorizes an unlimited fine and imprisonment of five years.[19] Each separate mailing made as part of a single scheme to defraud may be a separate mail fraud offense. *Center Cadillac v. Bank Leumi Trust,* 808 F.Supp. 213 (1992). Over the course of the parties' relationship, the defendant falsified pay-out reports, overcharged for expenses, and improperly changed expense allocation to a volumetric basis. If these actions were reported to the plaintiffs in the form of a mailed letter, extreme sanctions could have been levied on the defendant. For example, if the defendant had mailed five letters which contained fraudulent material to each plaintiff, they could have faced around fifty counts of mail fraud. Extremely large fines, with the possibility of 250 years imprisonment, would be warranted. *United States v. Paccione,* 751 F.Supp. 368 (1990), *affirmed* 949

F.2d 1183 (1991) (fine of $250,000 for mail fraud was reasonable in light of the defendant's income amounting to over $1 million dollars). *See also United States v. Shelton,* 669 F.2d 446 (1982). A sentence of twenty years was not abuse of discretion in light of massive fraud with losses approaching one million dollars; *United States v. Moss,* 631 F.2d 105 (1980). Where the defendant was convicted of twelve counts of mail fraud, his forty-five-year sentence was within the maximum sentence allowed.

[¶ 80.] As clearly stated in 18 U.S.C.A. § 1961(1)(B), "racketeering activity" means any act indictable under section 1341 (relating to mail fraud). Participating in RICO's prohibited activities allows both criminal and civil penalties. 18 U.S.C.A. §§ 1962–1964. The criminal penalty permits an unlimited fine and a maximum prison term of 20 years.[20] *Id.* The civil penalty includes the recovery of treble damages as well as the cost of the suit. *Id.* This includes a reasonable attorney's fee. *Id.* The sting of all the possible punishments that RICO permits would be one the defendant did not soon forget.

[¶ 81.] The majority concludes that the severity of other sanctions is in disproportion with the punitive damage award. However, when a broader spectrum of available sanctions is examined, the jury's award is well within acceptable tolerances. Also, while a less drastic remedy might possibly deter future misconduct, but there is no doubt that this verdict will assure that the defendant will not "do it again." This last factor fails to afford defendant any assistance.

[¶ 82.] This Court must also be "mindful that the trial court in passing upon the reasonableness of the jury verdict had the benefit of hearing and observing the same things as the jury, [and] has had the opportunity to observe the jury itself for signs of passion and prejudice, and has considered the amount of the verdict." *Brewer v. Mattern,*

---

**19.** As evidence of the severity of this crime, the statute was amended in 1994 to change the phrase "fined not more than $1,000" to read "fined under this title" thereby giving express authority to impose larger fines. Pub.L. 103–322, § 330016(1)(H).

**20.** As evidence of the severity of this crime, the statute was amended in 1988 to change the phrase "fined not more than $25,000" to read "fined under this title" thereby giving express authority to impose larger fines. Pub.L. 100–690, § 7058(d).

85 S.D. 356, 182 N.W.2d 327, 332–33 (1970). Since the trial court entered judgment adopting the jury's punitive damages verdict of $4.8 million, it is fair to assume that the trial judge, at the very least, did not oppose the verdict.

[¶ 83.] The jury returned this punitive damages verdict; the trial judge entered judgment imposing the punitive damages; and on appeal this court is split. 4.8 million dollars shocks the conscience of the majority, but for reasons unexplained one million dollars does not. In this area where the Court really has no special expertise to determine damages and did not see the witness nor hear the testimony, the "sacred kingdom of the jury" should not be disturbed. Because an analysis of the five factor test does not support a modification of the jury verdict, the jury's award of punitive damages should stand. I respectfully dissent.

[¶ 84.] TUCKER, C.J. for KONENKAMP, J., disqualified.