# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-CA-01658-SCT

*CHEVRON U.S.A., INC.*

*v.*

*ALCUS SMITH AND KAY SMITH*

| | |
|---|---|
| DATE OF JUDGMENT: | 8/30/1999 |
| TRIAL JUDGE: | HON. JAMES E. GRAVES, JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | LUTHER T. MUNFORD |
| | REUBEN V. ANDERSON |
| | MICHAEL B. WALLACE |
| | AMANDA JONES |
| | ROBERT E. MEADOWS |
| | WILLIAM R. KEFFER |
| | ROBERT O. ALLEN |
| ATTORNEYS FOR APPELLEES: | DAVID T. COBB |
| | ROBERT L. JOHNSON, III |
| | JAY BOLING |
| | STUART H. SMITH |
| | ROBERT RUSSELL WILLIARD |
| NATURE OF THE CASE: | CIVIL - PROPERTY DAMAGE |
| DISPOSITION: | REVERSED AND RENDERED - 10/17/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, PRESIDING JUSTICE, FOR THE COURT:**

¶1. In this oil field contamination case, Chevron, U.S.A., Inc. appeals from a judgment against it awarding landowners Alcus and Kay Smith $2,349,275.00 in damages in accordance with the jury's answers to special interrogatories. The jury found Chevron 100% liable, but it deadlocked on the issue of punitive

damages. The trial court granted a mistrial as to punitive damages, but it denied a new trial on that issue since a different jury would have to hear it, in violation of Miss. Code Ann. § 11-1-65 (2002). Chevron timely appealed to this Court, and the Smiths cross-appealed on the issue of punitive damages.

¶2. On appeal, Chevron contends (1) that the judgment for property damages should be set aside because the damages are limited to diminution in property value which the Smiths recovered from a settling defendant; (2) that the judgment should be reversed in favor of Chevron because the Smiths unreasonably refused to allow remediation by COHO, the current operator of the field; and (3) that the jury's finding that Chevron did not act as a reasonably prudent operator was unsupported by the evidence. On cross-appeal, the Smiths claim they are entitled to a new trial on the issue of punitive damages. In its amicus curiae brief the Mississippi Independent Producers and Royalty Owners Association ("MIPRO") raised the issue that venue was improper in Hinds County.

¶3. We find that the trial court erred in allowing a jury trial as the Smiths failed to exhaust administrative remedies before seeking relief in the trial court. *Donald v. Amoco Prod. Co.*, 735 So. 2d 161 (Miss. 1999). The Smiths were required under our precedents to first seek restoration of their property from the Mississippi Oil and Gas Board before a trial court could consider the issue and possibly assess an appropriate measure of damages. Accordingly, we reverse the trial court's judgment, and we render judgment here dismissing the Smith's complaint and this action without prejudice for failure to exhaust administrative remedies. The Smiths must seek relief before the Oil and Gas Board.

## FACTS

¶4. In 1943, Chevron acquired a mineral lease to the Brookhaven field "for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, laying pipe lines, building tanks, power stations, telephone lines and other structures thereon to produce, save, take care of, treat, store, transport and manufacture said minerals, and hous[e] [] employees." Eventually the field was unitized,[1] and Chevron became the designated field operator. In 1966, Chevron built a saltwater facility on one acre of the field to serve the oil wells throughout the entire field.

¶5. Saltwater is a natural by-product of oil and gas production, and the saltwater facility in the field took saltwater in by pipelines and stored it until it was disposed of or injected into wells. Some of the formations from which the oil was produced contained naturally occurring radioactive material ("NORM") which was also present in the water solution that was produced along with oil. The saltwater pipelines and storage tanks at issue in this case contained NORM. Small amounts of NORM can build up over time and can eventually lead to radioactive levels, which is what happened in this case.

¶6. In 1979, the Smiths purchased the surface rights to 55 acres of the Brookhaven field. The Smiths lived in Wisconsin at the time, but they bought the land for the purpose of building their retirement home on it. They were aware of the oil and gas operations, including the saltwater facility that was located on the land they purchased. The saltwater facility was operated by Chevron until it sold its interest in the field to Florabama in 1990. The Smiths contend that the facility was abandoned around the time they purchased the land in 1979. Chevron claims the saltwater facility at issue was still in active operation at the time it sold its interest to Florabama.

¶7. The contract between Chevron and Florabama financially obligated Florabama for any environmental cleanup. Florabama operated the field until 1995, when it sold its interests to COHO, whose contract in

turn made it financially responsible for any cleanup. COHO continues to operate the field today.

¶8. In 1994, neighbors of the Smiths' property informed the Smiths that the equipment on their property might contain NORM. This discovery was made after government testing showed that the drinking water of many of the residents had been polluted by Chevron's operations. In 1996, the Smiths filed this lawsuit against Chevron and its parent company, Florabama, COHO and other defendants in Hinds County Circuit Court. The trial court found that Florabama did not operate the saltwater facility in question and granted summary judgment in its favor. Florabama filed for bankruptcy a month before trial began. At the conclusion of trial, the Smiths appealed the dismissal of Florabama to this Court. While on appeal, Florabama settled with the Smiths for $75,000, and it was voluntarily dismissed.

¶9. The record indicates that one of Chevron's experts testified that one week before trial COHO made an offer to remove the saltwater facility, but the Smiths contend the offer was not made until the eve of trial. Nevertheless, the Smiths refused the offer. In light of the refusal, COHO was granted summary judgment precluding the Smiths from recovering the cost of removal from it. This left only Chevron and its parent company as defendants. After trial, COHO filed for bankruptcy. Chevron and COHO entered into an agreement for removing equipment and soil containing NORM from the entire Brookhaven field which was approved by the Bankruptcy Court, the Mississippi Oil and Gas Board, ("Board") and the Mississippi Department of Health. Many plaintiffs who sought relief in Lincoln County from the same defendants have allowed the cleanup. The Smiths filed this lawsuit immediately upon learning of the contamination and have continued to refuse the cleanup.

## DISCUSSION

¶10. *Donald v. Amoco Prod. Co.*, 735 So.2d 161 (Miss. 1999), sets a binding precedent in cases where plaintiffs seek to have oil producers clean up byproduct pollution. Under that case, plaintiffs must seek restoration from the Mississippi Oil and Gas Board before a court can properly assess the appropriate measure of damages.

¶11. Where an administrative agency regulates certain activity, an aggrieved party must first seek relief from the administrative agency before seeking relief from the trial courts. *State v. Beebe*, 687 So.2d 702, 704 (Miss. 1996) (*citing NCAA v. Gillard,* 352 So.2d 1072, 1082-83 (Miss. 1977); *Everitt v. Lovitt*, 192 So.2d 422, 426 (Miss. 1966); *Davis v. Barr*, 250 Miss. 54, 157 So.2d 505 (1963)). *Donald* states that, in cases where private plaintiffs are seeking clean up of oil production byproducts, the Oil and Gas Board "remedy is adequate and should . . . [be] exhausted prior to filing a private suit." *Donald*, 735 So.2d at 177. This Court cannot ignore *Donald* and fail to force the Smiths to seek relief from the Oil and Gas Board before filing suit in the trial court.

¶12. We also note that Mississippi law provides that it is the duty of the Oil and Gas Board to "make adequate rules and regulations . . . requiring the disposal of waste products such as, but not limited to, mud, acids, saltwater or any corrosive products brought to the surface from any oil, gas or condensate well in this state, to prevent seepage, overflow or damage and injury to the topsoil or surface." Miss. Code. Ann. § 53-1-17(l) (1999). The Oil and Gas Board has seen fit to classify NORM as part of this list and to promulgate regulations defining the proper methods for preventing NORM pollution and for the disposal of such byproducts. Miss. Oil & Gas Bd. R. 68 & 69. In the creation of the Oil and Gas Board, the intent of the Legislature was that the Board was to protect the general public from the dangers inherent in the production of oil and gas. Miss. Code Ann. § 53-1-17 (1999).

¶13. The regulatory scheme promulgated by the Legislature and the Oil and Gas Board is designed to protect the citizens of Mississippi from pollution resulting from oil and gas drilling operations. Pollution resulting from operations like Chevron affects the entire population of Mississippi, and every citizen has an interest in seeing that violations of statutes and regulations are enforced. Thus, pollution clean up operations have been deemed the responsibility of the Oil and Gas Board. The Board possesses a specialized knowledge of the dangers presented by oil and gas exploration and drilling, and its collective expertise in such areas as the proper disposal methods for radioactive waste is the best asset available in developing an effective disposal plan for the NORM in the Brookhaven field. The Board is more suited than the average juror to understand the broad scope of the regulations and the factual scenarios presented by each case of environmental pollution.

¶14. This Court cannot allow a private landowner to pursue restoration of his or her land in the courts of this State by sidestepping a very vital and useful agency that could help protect the average Mississippian from the dangers of NORM pollution. Since no court can order the plaintiffs in this case to expend the award on decontaminating the property, the outcome allowed by the trial court does nothing to protect the citizens of Mississippi from the dangers of NORM contamination. Nor will this Court allow a windfall to the plaintiffs who obviously have no intention of cleaning up their property since they have refused all such offers of cleanup. Not only will requiring the aggrieved property owner to pursue his claims with the Oil and Gas Board alert the Board to possible wide-reaching violations, it will benefit the courts of this state by helping reduce the amount of time necessary to try cases like this one (if the seven week trial in this instance was not enough). The citizens of this state are better served by having an expert regulatory agency enforce the environmental statutes rather than waiting for the private citizen to bring individual actions for damages and restoration, which are no guarantee that the pollution will be eradicated. Therefore, due to the Smiths' failure to exhaust remedies available to them from the Mississippi Oil and Gas Board prior to bringing the present litigation, this Court must reverse and render. Given this disposition, this Court does not separately address the punitive damages and venue issues.

<h2 style="text-align:center">CONCLUSION</h2>

¶15. Because the Smiths refused all offers of cleanup, by-passed the administrative remedy provided by the Oil and Gas Board and filed suit prior to exhausting administrative remedies, this Court must continue to adhere to *Donald*. Accordingly, we reverse the trial court's judgment, and we render the judgment here dismissing the Smith's complaint and this actions without prejudice for failure to exhaust administrative remedies. The Smiths are required to seek clean up relief before the Mississippi Oil and Gas Board.

¶16. **REVERSED AND RENDERED.**

**PITTMAN, C.J., WALLER, COBB AND CARLSON, JJ., CONCUR. McRAE, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, J. EASLEY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. GRAVES, J., NOT PARTICIPATING.**

**McRAE, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶17. Because the majority's interpretation of *Donald v. Amoco Production Co.*, 735 So.2d 161 (Miss.

1999), is not sound, I disagree. The Smiths were not required to exhaust administrative remedies by seeking restoration of their property from the Mississippi Oil and Gas Board before seeking relief in the trial court. However, I agree with the majority that the judgment in this case should be reversed. The trial court erred in fashioning the judgment from special interrogatories posed to the jury. Therefore, I would affirm the jury's determination that Chevron is 100% liable for its negligence and reverse for a new trial on damages. I would also grant the cross-appeal on punitive damages. Accordingly, I concur in part and dissent in part.

¶18. In *Donald*, we held that "the administrative remedy [was] adequate and should have been exhausted prior to filing a private suit." *Donald*, 735 So.2d at 177. It was not mandatory. It is true that the Board has jurisdiction to approve or order cleanup that will protect the public interest. Miss. Code Ann. § 53-1-17(1) (1999) states that "the board shall have jurisdiction and authority over all persons and property necessary to enforce effectively the provisions of this chapter and all other laws relating to the conservation of oil and gas." *See also* Miss. Code Ann. § 53-1-29. However, we also noted in *Donald* that our oil and gas "statutes and regulations do not provide for or prohibit private causes of action." 735 So.2d at 177. The issue in *Donald* was strict liability for waste disposal. The complaint specifically alleged that one of the defendants transported oil field waste to Donald's property and disposed of it there. *Id.* at 164. The case sub judice deals with NORM, not "the wrongful act of waste disposal" but more importantly, not strict liability. *Id.* at 167. Strict liability is a question of law, not a question of fact. General liability is a question of fact and should be sent to a jury for that determination.

¶19. While the exhaustion of administrative remedies may be necessary in some instances, there are other issues in this case that do not require complete exhaustion before the Board, namely, who is liable and to what extent. *Donald* does not preclude the Smiths from seeking damages from Chevron. *Id.* at 177. The Smiths have an option to pursue cleanup under our oil and gas statutes, *see* Miss. Code Ann. §§ 53-1-1 to -207 (1999), and while this is the preferred route to take, the decision to seek cleanup through the Board is not dispositive of the suit for damages in this case. The majority overlooks that *Donald* also allows the recovery of special damages. 735 so. 2d at 177.

¶20. I agree that the Smiths have no obligation to remediate the property and that it would be economic folly for them to spend the $2.3 million award for restoration to increase the property value to $55,000. I also agree with the majority that the Smiths may be unjustly enriched if the general verdict is allowed to stand and they pocket the money awarded for damages since they have the option to pursue cleanup through the Board. Therefore, I would reverse the judgment. However, I would affirm the jury's finding that Chevron is 100% liable for the cleanup since that finding is supported by the evidence in the record. There is no limit on the cost or expense to Chevron to perform the cleanup. If it costs $2.3 million or $2.3 billion, Chevron is liable for completion of the cleanup.[2]

¶21. The trial court erroneously fashioned the $2.3 million judgment from the special interrogatories. First, the trial court gave the jury, the trier of fact, the choice of which legal rule to apply. Such legal determinations are for the court to make, not the jury. Moreover, the special interrogatory posed to the jury regarding compensatory damages is flawed. Also, a judgment in the amount of $2.3 million is improper pursuant to *Waggener v. Leggett*, 246 Miss. 505, 150 So.2d 529 (1963)*.* The Smiths were not entitled to the compensatory damages award in excess of the diminution in value of the land. In *Waggener*, the defendants dredged a bayou and caused the plaintiffs' shoreline to collapse. *Waggener*, 150 So.2d at 531. The diminution in value was found to be no more than $500 so the trial court excluded evidence that it would cost $7,500 to restore the shore line holding that it was a permanent damage to the land and

therefore the difference in the value of the land before and after the trespass was the appropriate measure of damages. *Id.* at 531. *Waggener* distinguished between permanent and temporary injury to land and the applicable measure of damages and held as follows:

> For an injury to the land itself, permanent in nature, the general rule measuring damages is the difference in value of the land before and after the trespass. This means the difference in value of the entire tract, not merely the ground at the exact place of the injury. However, where the land can be restored to its former condition at a cost less than the diminution in value, if it is not restored, and also where the injuries are temporary and reparable in this sense, the cost of restoration may be used as a measure of damages. This latter rule is confined to cases where the cost of restoration is less than the difference in the value of the land before and after the trespass. *See* *Union Producing Co. v. Pittman*, 146 So.2d 553 (Miss.1962).

*Waggener*, 150 So.2d at 531. Temporary injury simply means that the injury is reparable. There is testimony that the value of the Smiths' land with no contamination was $55,000 and that there was a complete diminution of that value. Following *Waggener*, the largest amount of compensatory damages the Smiths can recover is $55,000, if there was in fact a complete diminution in value or if the cost of restoration exceeds the value of the land. *Id. Donald* also allows for special damages. *Donald*, 735 So.2d at 177.

¶22. Since the majority concludes that the Smiths should have gone to the Oil and Gas Board, it did not address the mistrial on punitive damages either. The Smiths filed a motion for a retrial limited to the issue of punitive damages which the trial court denied stating that "it cannot grant a new trial solely on the issue of punitive damages since Miss. Code Ann. § 11-1-65 (1972 as amended) requires that the same trier of fact hear evidence on both compensatory and punitive damages." On cross-appeal, the Smiths seek reversal of that order.

¶23. The Smiths rely upon Miss. Code Ann. § 11-1-65 (2002); *McCorkle v. McCorkle*, 811 So.2d 258 (Miss. Ct. App. 2001); and *Paracelsus Health Care Corp. v. Willard*, 754 So.2d 437 (Miss. 1999).[3] These two cases were remanded on punitive damages only. In *McCorkle*, the issue of punitive damages was never submitted to the jury during trial. Finding that the trial court erred, the Court of Appeals remanded the case on the issue of punitive damages only for submission to a jury. *McCorkle*, 811 So.2d at 271. Obviously, the original jury had already been dismissed so a different jury determined punitive damages on remand.

¶24. Chevron correctly states that § 11-1-65(1)(c) requires the same trier of fact to determine whether to award punitive damages after it determines compensatory damages. However, Chevron suggests that since § 11-1-65(1)(c) mandates that in order to have a retrial on punitive damages, the Smiths would have to request a new trial as to all damages so that the same jury could determine compensatory and punitive damages. This simply is not so, especially in light of the fact that the jury was deadlocked on the issue. On retrial for punitive damages, a trial court must merely give a jury instruction as to the compensatory damages already awarded.

¶25. The issue of punitive damages is no different from any other issue on which a jury is deadlocked; a retrial can be granted as to the issue which the jury was unable to decide. The trial court could have granted a new trial on punitive damages alone without contravening § 11-1-65. Since the trial court denied a new trial on the basis that §11-1-65 would not permit it, I would reverse and remand on the matter of punitive

damages with an instruction that the trial court inform the jury of the findings of the original jury. Since I would also reverse and remand for a determination of compensatory damages, the same jury would be deciding compensatory and punitive damages after all.

¶26. I find that *Donald* did not require that the Smiths exhaust administrative remedies. However, I would reverse and remand this case for a new trial on compensatory damages limited to the diminution in value of the property pursuant to *Waggener* and special damages pursuant to *Donald*. The jury's finding that Chevron was 100% liable should stand. I would also remand for a new trial on punitive damages. Accordingly, I respectfully concur in part and dissent in part.

### DIAZ, J., JOINS THIS OPINION.

### EASLEY, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:

¶27. I respectfully concur in part and dissent in part. I agree with the majority's decision to reverse the $2,349,275 judgment granted against Chevron U.S.A., Inc., but I would reverse and grant a remittitur rather than reverse and render. In 1979, the Smiths, who lived in Wisconsin at the time, purchased the surface rights to the 55 acres located in Lincoln County, Mississippi. The Smiths never lived on any of the 55 acres in question. The property was purchased with the intent that someday they might build a retirement home on it.

¶28. The value of the Smiths' land without contamination is $55,000. In my opinion, the judgment awarded against Chevron in the amount of $2,349,275 for contamination of the 55 acres unjustly enriches the Smiths. It is illogical to believe that the Smiths would spend their $2,349,275 award to restore the property to its uncontaminated value of $55,000. Furthermore, in my opinion, awarding the Smiths $2,349,275 to restore the property to its pristine value of $55,000 amounts to economic waste.

¶29. Here, we have a complete diminution of the value of the 55 acres and the cost of restoration exceeds the $55,000 set as the value of the land without contamination. Accordingly, the judgment against Chevron should be reversed and a remittitur granted from the trial court's award of $2,349,275 to $55,000. *See Waggener v. Leggett*, 246 Miss. 505, 508-09, 150 So.2d 529, 531 (1963); *Union Producing Co. v. Pittman*, 245 Miss. 427, 437, 146 So.2d 553, 557 (1962).

¶30. My primary concern is that we have no power over the Smiths to ensure that they will actually spend the $2,349,275 judgment to actually cleanup the property. Therefore, I believe that the learned trial court and the majority have erred in their determinations. The Smiths may request that the Mississippi Oil and Gas Board (Board) order Chevron to restore the property to its pristine condition, regardless of the cost of the cleanup (be it $2,349,275 or some other amount). However, pursuing the cleanup of the property via this avenue would ensure that the property will be restored to its pristine condition. This option prevents the unjust enrichment or economic waste of the $2,349,375 award to the Smiths.

¶31. The Board still retains jurisdiction over the contamination and can order the operators to perform the cleanup until its completion. Miss. Code Ann. § 53-1-17(7)(1999) provides:

> Notwithstanding any other provision contained in the Laws of the State of Mississippi, the [b]oard shall have exclusive jurisdiction and authority, and it shall be its duty, to make, after notice and hearing as hereinafter provided, such reasonable rules, regulations, standards and orders, and to issue such permits as may be necessary, to regulate the use, management, manufacture, production, ownership,

investigation and noncommercial disposal of oil field exploration and production waste in order to prevent, eliminate or reduce waste by pollution to acceptable levels in order to protect the public health, safety and the environment.

¶32. If either of the parties is aggrieved by the decision rendered by the Board, the appellate process is still available. The complaining party may appeal the Board's findings if the agency's actions (1) were unsupported by substantial evidence, (2) was arbitrary or capricious, (3) was beyond the power of the administrative agency, or (4) violated some statutory or constitutional right of the complaining party. *Boyles v. Miss. State Oil & Gas Bd.*, 794 So.2d 149, 152 (Miss. 2001); *Miss. Employment Sec. Comm'n v. Harris*, 672 So.2d 739, 741 (Miss. 1996); *Miss. Comm'n on Envtl. Quality v. Chickasaw County Bd. of Supervisors*, 621 So.2d 1211, 1215 (Miss. 1993); *McGowan v. Miss. State Oil & Gas Bd.*, 604 So.2d 312, 317 (Miss. 1992).

¶33. The Smiths have never pursued this course of action to have the property cleaned up. Instead, they filed suit in Hinds County, Mississippi. Furthermore, as noted by the majority, the Smiths have refused attempts to have the property cleaned. Chevron and COHO entered into an agreement to remove the equipment and soil containing the naturally occurring radioactive material (NORM) which was approved by the Bankruptcy Court, the Board and the Department of Health. COHO was granted summary judgment precluding the Smiths' recovery of the cost of removal based on the Smiths' refusal to allow the cleanup of the property.

¶34. As to the punitive damages, I believe that Miss. Code Ann. § 11-1-65 (2002) does not prevent retrial on the limited issue of punitive damages. While the normal procedure is to allow the same trier of fact to hear both the compensatory and punitive damages, I do not believe that Miss. Code Ann. § 11-1-65 prevents retrial on the limited issue of punitive damages where the original trier of fact was unable to reach a verdict on that particular issue.

¶35. However, I do not believe that the facts at bar support the award of punitive damages. The oil and gas production can result in NORM being present in the waste solution produced along with the oil. The build up of NORM over time is what produced the radioactive levels found on the property. Chevron had contracted with Florabama for the environmental cleanup of the property. Florabama operated the field until 1995, at which time, it sold its interests to COHO, making COHO responsible for the environmental cleanup of the property.

¶36. While I concur with affirming the trial court's determination that Chevron is 100% liable for its negligence, I do not believe that the record supports that Chevron's actions were reckless, wanton or grossly negligent. Therefore, I do not believe that a retrial on punitive damages is warranted in this case. Accordingly, I would reverse and remit the $2,349,275 judgment to the amount of $55,000.

1. All of the royalty owners and operators of the different tracts in the Brookhaven field agreed to pool the tracts into a single unit for consolidated operations.

2. Of course, COHO and Florabama may be contractually liable to Chevron for cleanup, but that matter is not before us.

3. The Smiths also cite to case law outside of our jurisdiction. *See King v. Macri*, 993 F.2d 294 (2d Cir. 1993), *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95 (4th Cir. 1991); *Grynberg v. Citation Oil &*

*Gas Corp.*, 573 N.W.2d 493 (S.D. 1997). While case law outside of our jurisdiction may be instructive at times, the cases cited by the Smiths are wholly inapplicable to this case as they all involve challenges to punitive damages awards which were all decided by the same jury that determined compensatory damages.